**TECOM, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–475C.

United States Court of Federal Claims.

March 25, 2009.

Karl Nelson, Saul Ewing LLP, Baltimore, Maryland, for plaintiff. Jason M. St. John, Saul Ewing LLP, Baltimore, Maryland, of counsel.

Michael D. Austin, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director, all of Washington, D.C., for defendant. John T. Lauro, Air Force Legal Services Agency, Department of the Air Force, Arlington, Virginia, of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

Tecom, Inc. brought a certified claim under the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq. ("CDA"), on behalf of its subcontractor Fleetpro, Inc. Tecom contracted with the United States Department of the Air Force ("Air Force") to provide, among other things, vehicle maintenance services at Peterson Air Force Base (AFB),

Colorado and at the related facilities Cheyenne Mountain Air Station and Falcon AFB. On motions for summary judgment, the Court had already found the defendant liable on a cause of action for breach of contract. *See Tecom v. United States,* 66 Fed.Cl. 736, 756–57, 776 (2005). The Air Force was contractually required to pay Tecom special compensation if the Peterson AFB Complex vehicle fleet was in such a condition that more than 355 labor hours' worth of repairs were inherited by Tecom as of December 1, 1996. As it was undisputed that the required repairs at the contract start date were significantly in excess of this amount, and the government only paid Tecom special compensation for a fraction of this work, the Court found liability established for breach of contract. *Id.* at 757. A trial on damages was then held, and as is described in detail below, the Court finds that Tecom has proven damages totaling $818,256.87, plus interest.

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff's First Amended Complaint ("Complaint") asserted five causes of action against the government: (1) an equitable adjustment for a constructive change to the contract, based on the vehicle fleet being in much worse condition than the contract indicated, *see* Compl. ¶¶ 34–37; *Tecom,* 66 Fed. Cl. at 742, 774–75; (2) breach of contract, for failure to pay additional compensation for an excess backlog of required maintenance, *see* Compl. ¶¶ 38–39; *Tecom,* 66 Fed.Cl. at 742, 749–57; (3) breach of the implied duty of cooperation, *see* Compl. ¶¶ 40–42; *Tecom,* 66 Fed.Cl. at 742, 772–73; (4) breach of the duty not to hinder or interfere with performance, *see* Compl. ¶¶ 43–45; *Tecom,* 66 Fed.Cl. at 742, 772–73; and (5) wrongful termination for default. *See* Compl. ¶¶ 46–47; *Tecom,* 66 Fed. Cl. at 742, 775–76.

The contract at issue, number F05604–97–C–9001, plaintiff's trial exhibit ("PX") 1, was awarded to Tecom on October 21, 1996. *See Tecom,* 66 Fed.Cl. at 739. This lawsuit concerns the Vehicle Operations and Maintenance portion of the contract. Under a "firm fixed price" provision, Tecom was to receive $76,282 per month during an initial, ten-

month term, for maintaining a base fleet of 563 vehicles. PX 1 at 3, ¶ 7AA; *Tecom,* 66 Fed.Cl. at 739. The contractor was required to meet two separate standards in maintaining the fleet—the percentage of vehicles out-of-commission at any one time could not exceed the vehicle out-of-commission ("VOC") rate established for each vehicle category, and a certain number of each type of vehicle had to be in working order at all times to satisfy Minimum Essential Levels ("MELs"). *Tecom,* 66 Fed.Cl. at 739. Fleetpro was the subcontractor performing the vehicle maintenance work under the contract, until the subcontract was terminated by Tecom on June 2, 1997. *See id.* at 742.

In the context of summary judgment motions, the Court interpreted the key provisions of the contract and found certain facts established beyond dispute. The critical contract provisions are contained in the "Performance Work Statement for Vehicle Operations and Maintenance Services for Peterson Air Force Base Complex Colorado" ("PWS"). The most important paragraph reads:

> On the contract start date, the required maintenance actions will not exceed 25 labor hours per 100 vehicle equivalents and there will not be any overdue scheduled/preventive maintenance and special inspections/test. If either of these standards are exceeded, the incoming contractor shall reduce this backlog and will be compensated for this initial reduction IAW the over and above hourly rate and material costs as verified by invoices input into the OLVIMS. The contractor shall have thirty (30) days to meet the performance requirements for these services. This compensation does not apply to the incumbent contractor.

PX 1 at 88 (PWS ¶ 5.5. 1).

The parties were in agreement that "25 labor hours per 100 vehicle equivalents" translated into 355 labor hours, given the size of the fleet. *Tecom,* 66 Fed.Cl. at 740. The Court found that this provision was intended "to have the Air Force bear the risk of excessive maintenance work inherited by the incoming contractor." *Id.* at 753. The "OLVIMS" referenced was the Air Force's

On–Line Vehicle Interactive Management Service (OLVIMS).[1] *See* PX 1 at 63 (PWS ¶ 2.2.28). The Court rejected the government's interpretation of this provision as limiting the backlog to the required maintenance actions that were entered into OL-VIMS by Tecom's predecessor. *Tecom*, 66 Fed.Cl. at 753.

From the second week of November through November 26, 1996, inspections of the vehicle fleet conducted jointly by representatives of Fleetpro, the Air Force, and outgoing contractor LB & B Associates, Inc. ("LB & B"), assessed the condition and maintenance status of 236 of the 563 vehicles in the fleet. *Id.* at 744. The government's litigation position was that these inspections were unauthorized or wrongful, but the Air Force personnel involved at the time called them the "assessment" or "joint assessment" required by a contract clause contained in both the outgoing incumbent's contract and that of Tecom. *See id.* at 740 & n. 6, 744–46, 754, 756. This clause, entitled "Vehicle Assessment," reads: "At contract termination, the incumbent contractor, incoming contractor, and FAC shall jointly assess all vehicles to be transferred to the new contract or Government for quantity, condition, and maintenance status." PX 1 at 88 (PWS ¶ 5.5.2). The Court found that the joint inspections were conducted under the vehicle assessment clause. *Tecom*, 66 Fed.Cl. at 754–56.

These joint inspections revealed that an alarming amount of repairs was needed for the fleet, including severe safety issues with vehicles upon which maintenance work had recently been performed. *Id.* at 744. Undisputed facts established "that labor hours far in excess of 355 were needed to make the inherited repairs." *Id.* at 757. Based on just the 236 vehicles assessed, the Air Force's own documents estimated that 2500 to 3000 maintenance hours were needed above the 355 labor hour threshold of the contract, and acknowledged that the total backlog could exceed 6000 hours. *Id.* at 745–46. The VOC rate for the vehicle fleet at

contract turnover was also far in excess of the limit, and the VOC rates applying to at least five categories of vehicles were exceeded. *See id.* at 746, 775. As the contract entitled Tecom to additional compensation for reducing a maintenance backlog exceeding 355 labor hours of repair work, and Tecom was only paid for a fraction of this reduction, the government was found liable for breach of contract and summary judgment was granted to Tecom on its second cause of action. *Id.* at 757. The Court also granted summary judgment in favor of the government on the wrongful termination claim. *Tecom*, 66 Fed.Cl. at 776. Summary judgment was denied both parties on the two breach of implied duty claims. *Id.* at 773. And the government's motion for summary judgment on the equitable adjustment count was denied, as the Court concluded that "the undisputed evidence of the VOC rates being exceeded at contract turn-over support a claim for an equitable adjustment under Tecom's contract for vehicle maintenance." *Id.* at 775.

With its pre-trial disclosures, plaintiff filed a short motion for summary judgment on the equitable adjustment count of the complaint. Tecom argued that the undisputed facts that had been established during the earlier summary judgment proceedings were sufficient to prove liability on this count, as the government "expanded Tecom's scope of work to include thousands of hours of backlog maintenance." Mot. for Summ. J. on Count I at 2–3. The government responded with a motion to strike, arguing that Tecom's motion was "redundant" and "a waste of litigation resources." Def.'s Mot. to Strike at 1. Defendant recognized that the equitable adjustment count and the breach of contract count "are mirror images of each other," and that "resolving the amount of damages" under the latter "will necessarily also resolve the amount of damages to which Tecom would be entitled" under the former. *Id.* at 3–4. It was determined at the pre-trial conference that no evidence relating to the issue of liability would be introduced at trial, and the plaintiff for purposes of the equitable adjust-

---

1. OLVIMS is also identified as the "On–Line-Vehicle–*Integrated* Management System." PX 1 at 85 (PWS ¶ 5.2.3.1) (emphasis added).

ment claim would rest upon the facts already found undisputed. *See* Pre–Trial Tr. at 6–12.[2]

As the Court had previously explained, "[f]or a contract to be constructively changed, the plaintiff must demonstrate that the Government expressly or impliedly ordered the contractor to perform work that was outside the contract requirements." *Tecom*, 66 Fed.Cl. at 774 (citations omitted). There is no doubt that, based upon the facts found to be undisputed, *see id.* at 743–48, 757, 775, the government did constructively change the contract by ordering work to be performed that was beyond the contract requirements. Under the contract, Tecom was required to maintain the vehicle fleet in such a condition that several VOC rates were not exceeded, *see id.* at 739, 775 (citing, *inter alia*, PWS ¶¶ 5, 5.2.1 & 5.2.2.1), but the fleet it received at contract turnover did not comply with these standards. *Id.* at 746, 775. Even more to the point, the vehicle maintenance services that Tecom performed at a firm fixed price were limited to no more than 355 labor hours' worth of repairs already required as of the contract start date, yet Tecom was required to perform repairs of inherited defects requiring "labor hours far in excess" of this amount. *Id.* at 757. The work performed to reduce the maintenance backlog in excess of 355 labor hours constituted a constructive change, and the undisputed facts demonstrate that Tecom is entitled to an equitable adjustment for this work. Accordingly, liability has been established and judgment is GRANTED to Tecom on Count I of its complaint. As the Court anticipated, this claim is "functionally one in the alternative," *id.* at 775, and since the contrac-

tual obligation which was found breached by the government was the promise to pay special compensation for this additional work, the damages will be the same under either count. The Court notes that the parties were in agreement on this point. *See* Def.'s Mot. to Strike at 3–4; Pl.'s Opp'n to Def.'s Mot. to Strike at 3; Pre–Trial Tr. at 6, 8.

After it was determined during the pretrial conference that liability on Count I was to be based on the facts found to be undisputed, plaintiff withdrew the two claims for breaches of the implied duties, orally stipulating to their dismissal. Pre–Trial Tr. at 12–13. As a consequence, Counts III and IV of the complaint are DISMISSED with prejudice.

**B. The Trial**

Having found the government liable for breach of contract, the Court held a trial over five days to determine the damages that plaintiff incurred performing work that was "over and above" ("O & A") the 355 hours needed to reduce the backlog maintenance of vehicles covered by the contract. Plaintiff presented two witnesses, Messrs. Thomas Farcosky,[3] President of Fleetpro and John R. Gilchrist, former Executive Vice President of Tecom. The defense itself called upon Mr. Farcosky, and also called Messrs. John McCowen, a former Air Force employee who was retained by the government as a consultant during trial,[4] and George E. Miller, a financial analyst qualified as an expert witness.[5]

Plaintiff introduced into evidence its Request for Equitable Adjustment ("REA"), a

**2.** The agreement of the parties on this procedure rendered the motion to strike moot. The motion is nevertheless DENIED, as the document to which it was directed is not a pleading. *See* Rule 12(f) of the Rules of the United States Court of Federal Claims ("RCFC").

**3.** The government's motion *in limine*, arguing that Mr. Farcosky could not testify as to how plaintiff identified repairs that were "over and above" the contract requirements unless he complied with the procedures relating to an expert witness, was DENIED at the pre-trial conference. Pre–Trial Tr. at 16–17.

**4.** The government's designation of Mr. McCowen as its party representative under Rule 615(2) of

the Federal Rules of Evidence, *see* Pre–Trial Tr. at 26–27, its failure to disclose that he was no longer an officer or employee of defendant, and his resulting presence during portions of Mr. Farcosky's testimony complicated the proceedings. *See* Tr. at 138–46, 633–46; Order (May 4, 2006); Order (Sept. 26, 2006); Mem. Op. & Order (Oct. 2, 2006).

**5.** Plaintiff's motion *in limine*, seeking to prohibit Mr. Miller from testifying because of his focus on total costs and failure to address the contract in question, was also DENIED at the pre-trial conference. *See* Pre–Trial Tr. at 14.

six volume document describing its entire claim for damages. PX 2A–2F. In addition to the contract, *see* PX 1, plaintiff's other evidence included an estimate of the costs of reducing the backlog maintenance, prepared December 12, 1996, PX 4; invoices relating to the development of a database to track required repairs and a copy of the database on compact disc, PX 5, 6; documents from the audit conducted by the Defense Contract Audit Agency ("DCAA"), PX 7–12; and a summary exhibit identifying the final amount of damages claimed at trial. PX 13. The defendant's exhibits ("DX") included the expert report of Mr. Miller, DX 49; invoices for the reimbursement of various specified costs, DX 16, 100–25; a delayed maintenance report from OLVIMS as of December 2, 1996, DX 11; contract modifications authorizing and then rescinding the installation of hardware, DX 34, 44; a March 1997 memorandum by Mr. McCowen concerning Fleetpro's maintenance performance, DX 58; documents concerning VOC rates for December 1996, DX 59; documents relating to contract discrepancy reports ("CDRs"), DX 67, 69, 70, 79, 81, 84, 86; the contract modification which authorized partial compensation for reduction of the maintenance backlog, DX 131; and correspondence between Tecom and Fleetpro. DX 30, 36.

Before turning to the testimony, a little more needs to be said about the REA. Binder I contains the actual REA, including the "Quantum," a line-by-line breakdown of the costs that Fleetpro seeks to recover. *See* PX 2A. Binder II contains exhibits referenced by the first binder. Tr. at 33; *see* PX 2B. Binder III contains a vehicle summary and the joint serviceability inspection documents, both of which are referenced by the REA. Tr. at 34; *see* PX 2C. Binder IV, entitled "Work Classification," contains 22,846 work entries documenting Fleetpro's maintenance activities. Tr. at 34–35; *see* PX 2D. Binder V contains the work orders that the Air Force deleted from its OLVIMS database. Tr. at 35–36; *see* PX 2E. These first five binders comprise the REA as originally submitted. Tr. at 36. Binder VI represented plaintiff's revised claim as of November 17, 1998, including amendments to reflect the results of the DCAA audit.[6] Tr. at 36; PX 2F.

## C. The Witnesses[7]

### 1. Thomas A. Farcosky

Plaintiff's principal witness was Mr. Thomas A. Farcosky, the president and majority shareholder of Fleetpro. Tr. at 18. Mister Farcosky provided an overview of Fleetpro's business. The company has been in its present form since 1985, but traces back to a predecessor that was started in 1982. *Id.* Fleetpro's primary business was preventative maintenance and inspections of fleet vehicles and equipment. Its clients have included governmental and commercial entities with fleets of vehicles, from municipal, state, and federal government entities to private business such as delivery companies. *Id.* at 21–22. Fleetpro was Tecom's subcontractor for two aspects of the Peterson AFB contract for which the Air Force required the participation of a small business—operation of a bus, taxi, and motor pool service, and maintenance of all of the fleet vehicles. *Id.* at 27–29.

Mister Farcosky explained how the joint inspections were conducted in the run-up to the December 1, 1996 contract turnover date. These inspections were performed through November 22, 1996, by representatives of the Air Force, Fleetpro, and outgoing contractor LB & B, *see* PX 2C at Tab 142 (identifying personnel involved and containing inspection results), and assessed approximately 38% of the vehicle fleet. Tr. at 60–61. Mr. Farcosky was personally involved in the assessment process, supervising the Fleetpro personnel. Tr. at 61–62, 483–5. The outgoing contractor initially resisted inputting the results of the inspections into OLVIMS until directed to do so by the Air Force, and as a consequence all of the required repairs that were identified for the inspected vehicles had

---

**6.** The DCAA audit concluded that plaintiff had actually *understated* its damages by $27,744. *Tecom,* 66 Fed.Cl. at 774.

**7.** This portion of the opinion contains findings of fact pursuant to Rule 52 of the Rules of the United States Court of Federal Claims.

not been recorded into the system by the time Fleetpro assumed responsibility for maintaining the fleet. Tr. at 49, 52. But what had been entered by December 1, added to needed repairs already shown in the database, resulted in 228 vehicles needing 3,707.2 hours of labor on repairs inherited by Fleetpro. *See* PX 2B, Tab 43 at 5; Tr. at 57–60. All told, some 234 vehicles had open work orders at that time, and the VOC rate was 39.6% of the fleet. Tr. at 46, 50–51, 56–57; *see also* PX 2B Tabs 41 & 42; PX 2B, Tab 52 at 4. Mister Farcosky explained that the joint inspections stopped at the direction of the Air Force, but that three crews operating daily could have inspected the rest of the fleet by November 30, 1996. Tr. at 61–62.

It appeared from the joint assessment that the operators of the vehicles had been neglecting the daily inspections that were required of them, failing to check such things as oil and other fluid levels and tire pressure, and not reporting vehicles for maintenance when safety defects such as brake and steering problems were noticed. Tr. at 50–51, 86–89, 91; PX 2B, Tab 39 (Air Force memo concerning operator inspections); *see also* PX 2B, Tabs 20 (instructions for operator inspections), 118 (AF Form 1800 for operator inspections). As a consequence, these vehicle defects became more severe over time. Tr. at 91. Indications of poor preventative maintenance by Fleetpro's predecessor were also noted; for instance, insufficient use of grease resulted in an abnormally high number of tie rods needing replacement. Tr. at 93–94.

When the joint inspections began, there were roughly 40 vehicles being kept at the maintenance yard facility because of needed repairs. Tr. at 84; PX 2B, Tab 17. Because of the vehicle defects discovered during the joint inspections, at contract turnover this number swelled to approximately 150 vehicles. Tr. at 70. To reduce this number and return vehicles to their units for use, Major Mark Karzon reviewed the pending work orders, identified vehicles needing the repair of severe safety defects, and ordered that the rest be released. Tr. at 70–71. This left about 117 vehicles in the yard. Tr. at 71.

The repairs that were not deemed to involve severe safety issues were given an "L" code in the OLVIMS database, signifying deferral for lack of funds. *Id.; see* PX 2B, Tab 48. Fleetpro brought to Major Karzon's attention several vehicles ordered to be released which the company believed contained safety defects, *see* PX 2B, Tab 25, but was told to release them. Tr. at 74, 76–77. Others suffered from what would otherwise have been considered non-deferrable maintenance defects, problems which would magnify if not corrected. Tr. at 77–79. As a consequence, the cost and complexity of making the associated repairs "dramatically increased." Tr. at 79. Vehicles that were released were soon returned to the shop, having broken down. Tr. at 80–81.

Shortly after assuming maintenance responsibilities, Fleetpro was asked by the Air Force to develop an estimate of the cost to reduce the enormous maintenance backlog and bring the fleet into compliance with the serviceability requirements. Tr. at 63. Extrapolating from the results of the joint inspections, on December 12, 1996 Mr. Farcosky produced an estimate that assumed the backlog would total 8,319 labor hours of work. Tr. at 66–68; PX 4. He believed at that time that the mechanics' labor would cost $287,847, that repair parts would total $317,374, and that the overall cost of reducing the backlog would be $676,464. PX 4 at 1; Tr. at 69. Although the work could have been accomplished, by beefing up staff and running three shifts, in as few as six weeks, the estimate spread the work and the costs over six months—after Tecom and Fleetpro discussed the various options with Major Karzon, the Air Force's Functional Area Chief responsible for maintenance at the Peterson AFB Complex. Tr. at 69; *see* PX 4 at 1.

After being told that the Air Force only had about $50,000 immediately available, Mr. Farcosky determined that two weeks of the six month plan could be accomplished, and Modification P00001 was issued. Tr. at 72–73, 75–76, 488–89; DX 131. This modification authorized a two shift operation for two weeks to work on severe safety items, and provided up to $52,913 for these purposes.

DX 131 at 131.2. Tecom apparently informed Fleetpro that the limit on costs under the modification was $52,414, *see* PX 2B, Tab 62, and this amount of backlog maintenance was performed and reimbursed. Tr. at 75–76, 227; *see* PX 2A, Tab P at P–15. Fleetpro had already hired additional mechanics to work on the backlog, on top of a staffing level that was already higher than anticipated. Tr. at 75, 236–37; *see also* PX 2B, Tab 80 at 1. The work was done on the vehicles whose work orders were identified by Major Karzon as having severe safety defects, although the particular items that were considered severe were not specified. Tr. at 490, 511–12; *see also* PX 2B, Tab 94 (Tecom memo dated Jan. 13, 1997, stating safety deficiencies on identified vehicles were corrected). Once the safety defects were repaired, six of the additional mechanics were terminated. PX 2B, Tab 57.

Mister Farcosky testified that, even though the contract required that when needed repairs were identified these must be entered into OLVIMS, Tr. at 62–63, 97–98, the Air Force in late January, 1997 ordered that several thousand repair items be deleted from the system. Tr. at 97, 101–03, 105–06; *see* PX 2B, Tab 61 at 1. These included not just the "L" coded items, but also safety defects and work that was already completed. Tr. at 103. A technical sergeant in the Air Force determined the items to be deleted by going through a pile of work orders and circling notations which referenced the work status. Tr. at 101, 105–110, *see* PX 2E (binder containing a copy of each work order so marked). Major Karzon told Mr. Farcosky that OLVIMS was not to contain information that would help Fleetpro identify inherited repairs at contract turnover, as this would "help you document your claim against us." Tr. at 113. But once this information was deleted, the OLVIMS reports misleadingly showed low VOC rates and misrepresented the condition of the vehicle fleet. Tr. at 104.

The combination of the massive backlog and the deletion of known, identified vehicle defects from OLVIMS hindered Fleetpro's ability to plan repairs on a timetable. Tr. at 98–99. Parts could not be ordered ahead of time, causing delays and inefficiencies. Tr. at 110–11. Delays raised the VOC rates, resulting in the issuance of CDRs and deductions from payments. Tr. at 112, 394. Vehicle defects which had already been identified would be rediscovered by a needless reinspection when the vehicle was turned in for breakdown maintenance—as it was not practical for the customer service center personnel to take ten minutes retrieving the paper copy of the deleted work orders, kept in vehicle jackets in the central filing system, to avoid a seven-to ten-minute cursory inspection. Tr. at 98–100, 494–96, 500. On the other hand, parts which had already been ordered to make repairs which had already been identified ended up sitting on shelves for longer than the Air Force allowed as Fleetpro waited for vehicles to be brought back in for maintenance. Tr. at 99–100, 391–92; *see* PX 2B, Tab 110 (McCowen QAE Inspection Results for Jan. 97, noting delayed maintenance was unacceptable because, *inter alia,* parts were not installed within 90 days). And when the many vehicles which should have been out of commission because they required repairs were ultimately brought to the maintenance yard, the VOC rates would appear to get worse, although the higher rates merely reflected the reality of the inherited condition of the fleet. Tr. at 394, 688–90.

Mister Farcosky explained how the Fleetpro database called "Work in Progress," or "WIP," was developed to track and measure the maintenance backlog and the company's efforts to reduce it.[8] The database started as an Excel spreadsheet that was created to try and improve the accuracy of the "estimated time in completion" ("ETIC") that the shop was giving to the operators of vehicles. Tr. at 114–16. The maintenance backlog rendered OLVIMS incapable of providing these estimates, as the Air Force database was not able to track work in progress involving multiple repair jobs. Tr. at 115–16. Fleetpro also used its own database to track the defects deleted from OLVIMS, Tr. at 99, and to anticipate needed parts based on vehicle histories. Tr. at 116–17. Mister Farco-

---

8. There is some confusion regarding whether the "P" in WIP stands for "Progress," *see* Tr. at 97, 105, 119, 121, or "Process." *See* PX 2A at 107 & Tab P at P–11; PX 2B, Tab 104; DX 34 at 34.4.

sky testified that it was only because of the maintenance backlog that WIP was needed, as OLVIMS otherwise could have sufficed. Tr. at 135. But the massive amount of inherited repairs posed problems that the archaic OLVIMS database could not help solve, and these shortcomings were amplified when the Air Force would not allow Fleetpro to track the O & A repairs in OLVIMS. Tr. at 526–27. In addition, the maintenance backlog prompted the Air Force to require Fleetpro to report on whether certain milestones were achieved in restoring the fleet to a serviceable condition—most prominently, critical vehicle reports and key performance indicators ("KPIs"). Tr. at 124–25; see PX 2B, Tabs 83 (example of daily KPIs), 84 (critical vehicle report for April 1997), 122 (daily KPIs, January through May, 1997). These reports could not be produced using OLVIMS. Tr. at 135–37. Thus, WIP was developed to offset inefficiencies that were caused by the maintenance backlog and by the Air Force's actions in response. Tr. at 545–46. Fleetpro engaged the services of consultant Joe Budge to develop WIP as a database that would allow the company to segregate O & A costs from work covered by the firm fixed fee portion of the contract. Tr. at 120–23. The database was designed so that information could be downloaded from OLVIMS using the Air Force's Condor program, and then read into WIP, to which shift change, parts used, and ETIC information could be added. Tr. at 124–26, 546–48. The database would then be able to generate the critical vehicle and KPI reports, to improve ETICs and allow for productivity analysis, and to differentiate maintenance backlog costs from the routine costs covered under the contract. Tr. at 125–26, 135–37, 546–48. On cross-examination, Mr. Farcosky emphasized that the WIP database was never physically connected to OLVIMS. Tr. at 543.

Plaintiff contends that four contract discrepancy reports,[9] that reduced its compensation paid under the contract by $8,161.39, were the result of the government's breach

of contract and the excessive maintenance backlog that Fleetpro inherited. Tr. at 394–95; PX 2A, Tab L. Mister Farcosky explained that he believed that these CDRs were issued in violation of the Air Force's Quality Assurance Surveillance Plan ("QASP"), which required that the Quality Assurance Evaluator ("QAE") first determine that the government was not the cause of an unacceptable performance before a payment deduction is made. Tr. at 392–93; see PX 2B, Tab 106 at 7 (QASP providing that a condition for the initiation of a discrepancy report is that "the QAE determines it is not government caused"). On cross-examination, he elaborated that Fleetpro was not disputing the particular basis for any of the CDRs, such as VOC rates being exceeded, but rather was raising the more general criticism that the Air Force failed to take into account how its own actions or inactions contributed to the contract deficiency. Tr. at 572–73.

Mister Farcosky also explained that, when Fleetpro was drafting the bid for the vehicle maintenance portion of the contract, it discovered that the incumbent had been operating at sixty percent productivity, meaning that forty percent of its employees' paid hours were not documented for the performance of specific maintenance work. Tr. at 117–18, 206. Although the staffing level that was bid was based on the same productivity level, Fleetpro had the goal of eighty percent productivity, which would mean fewer employees, reduced costs, and a sufficient margin earned on the contract to cover their overhead and provide a reasonable profit. Tr. at 118, 206, 208. As it transpired, the Fleetpro payroll records confirmed that its mechanics met the eighty percent productivity goal. Tr. at 231–32; PX 2A, Tab A.[10]

The vehicles that the Air Force determined not to have severe safety problems and ordered released from the maintenance yard ultimately were to return to the maintenance facility for the repair of the inherited defects, and those which were jointly as-

---

9. Plaintiff in its REA incorrectly refers to these as Contract *Deficiency* Reports. *See* PX 2A at 171, Tab L, Tab P at P–12; *see also* Tr. at 223, 392.

10. The labor hours documented in OLVIMS were 12,032.5, and the total hours for mechanics in the payroll records were 15,098.33, resulting in a productivity rate of 79.7 percent. *See* PX 2A, Tab A (rounded to 80%).

sessed but whose records were deleted from OLVIMS would eventually come to the shop for repair of the previously-identified defects, either in conjunction with breakdown maintenance or the semi-annual or annual inspections. *See* Tr. at 79–81, 91–92, 103, 110–11, 492, 497–98. Since the Air Force stopped the joint assessments in November, *see* Tr. at 61, and rejected Fleetpro's proposal to inspect the rest of the vehicles to identify pre-existing defects, *see* PX 2B, Tab 61 at 1 (Jan. 24, 1997 memo from Contracting Officer), the inherited repairs for the bulk of the fleet would not be identified and performed until vehicles came in for regular inspections or maintenance. *See* Tr. at 155–56. Although the Air Force initially indicated that it would attempt to obtain funding for the backlog maintenance effort, Tr. at 72, it soon became apparent that the Air Force was not going to provide any additional up-front or contemporaneous funding for repair of the inherited defects, beyond the amount paid under Modification P00001. Tr. at 112–13, 149.

In discussions with Major Karzon, the Functional Area Chief, Mr. Larry D. Ozburn, the Contracting Officer, and Mr. James Redd, the Peterson AFB small business officer, Tecom and Fleetpro were told reimbursement of the costs of reducing the excess maintenance backlog would be administered by the processing of invoices for equitable adjustments. Tr. at 148–50; *see* PX 2B, Tab 61 at 4 (notes from Jan. 30, 1997 meeting with small business officer at Peterson AFB, indicating the SBA officer instructed Fleetpro to submit equitable adjustment invoices to process payments for O & A work). The Contracting Officer advised them to submit the invoice at the end of the first contract year. Tr. at 150. Because of the segregation of costs provision in the contract, Tr. at 151–52; *see* PX 1 at 20 (Clause 5352.232–9501, "Segregation of Costs"), Fleetpro was instructed by Tecom to segregate O & A costs to facilitate the filing of an equitable adjustment invoice, and a subcontract modification to this effect was executed. Tr. at 104–05, 150–52; PX 2B, Tab 72 (subcontract change order # B002, requiring Fleetpro to segregate O & A costs). Beginning in February 1997, Fleetpro began assembling the

information that would ultimately be submitted in the Tecom REA. Tr. at 150.

Mister Farcosky explained how the O & A costs were identified and separated from the costs covered by the fixed fee portion of the contract. For the vehicles which had been inspected as part of the November 1996 joint assessments, over 3,700 hours of required maintenance work had already been identified, and was reflected in hard copies of work orders and inspection reports. Tr. at 153–55; *see also* PX 2B, Tab 43; PX 2C, Tab 142. These estimates were made by Fleetpro's predecessor, and included many one hour "inspect and analyze" tasks which, once performed, revealed a preexisting cause of the particular defects which in turn needed to be repaired, raising the hours and costs associated with the inherited maintenance on these vehicles. Tr. at 153–54. In addition, some defects identified before December 1, 1996 had worsened after the Air Force ordered the vehicles to be returned to their operators before they were repaired, complicating the repairs and increasing their associated costs. *See* Tr. at 79–80; PX 2A at 177–78. But approximately 62% of the vehicle fleet was not inspected in November 1996. Tr. at 60, 155.

For the bulk of the vehicle fleet, Fleetpro had to determine, after the fact, which of the subsequently-identified repairs were required prior to the December 1, 1996 contract start date. To spearhead this effort, Fleetpro brought to Peterson AFB Mr. Thomas Kilchenstein, an employee who was not originally slated to work on the contract. Tr. at 155. Under Mr. Farcosky's direction and personal supervision, Mr. Kilchenstein trained vehicle inspectors to identify parts which were so worn that they needed repair, but were in vehicles whose usage was so minimal since contract turnover that the defect must have existed prior to that date. *See* Tr. at 155–59, 165–66. The examples that Mr. Farcosky gave to illustrate these items included: disc brakes that could not have gone from an acceptable to an unacceptable pad thickness given the amount of miles driven since December 1, 1996, Tr. at 156–57; tires whose treads were well below the required depth, Tr. at 161–63; and threadbare

seats. Tr. at 164–65. The maintenance history of vehicles was also reviewed to determine if the frequent replacement of certain parts indicated the existence of another defect that had not been corrected—such as batteries which were replaced due to a defective alternator or charging system. Tr. at 167–69. Mister Kilchenstein reviewed the inspection results and every line item in the resulting work orders, and identified the repairs that must have been needed prior to December 1, 1996. Tr. at 165–66. The results were reviewed by Mr. Farcosky, who would personally look at individual vehicles as part of the review process. Tr. at 159. The expected rate of wear of these various parts was based on Fleetpro's and Farcosky's fourteen years of experience in providing vehicle maintenance, and Mr. Farcosky was personally involved in the inspections and determinations. Tr. at 158–59, 161.

After the initial determinations were made that repair items were preexisting O & A repairs, the information was entered into a field in the WIP database, and the determinations were then audited by a group of "subject matter experts," which included Mr. Farcosky. Tr. at 173–75; PX 2A at 17. These individuals considered whether the O & A items met a set of protocols adopted for identifying inherited repairs, such as repairs whose need was documented prior to December 1, 1996, repairs which were uncovered in the course of the O & A "inspect/analyze" work, and repairs to parts whose poor condition could not have been caused by the amount of mileage put on a vehicle beginning December 1, 1996. Tr. at 174–77; PX 2A at 177–78. Any O & A items that were viewed as questionable were then directed to a management review team, which included Mr. Farcosky, Mr. Budge, and Mr. Jim Dulling. Tr. at 178–79. That team then cut back on the O & A items, among other things dropping the costs of multiple inspections of the same vehicles even though these were necessitated by the Air Force's order to return the vehicles to their operators before all repairs were completed. Tr. at 179–80. And then a final layer of review, which Mr. Farcosky called a "stratification audit," was performed. Tr. at 180. Mister Farcosky explained that repairs were sorted on a cost basis, ranging from high to low, by part costs and repair hours, so that a representative sampling could be closely scrutinized. Tr. at 180–81. This final layer of review resulted in a few corrections to the O & A items. Tr. at 181.

Mister Farcosky then discussed how the repair work that was identified as O & A was translated into the costs contained in the REA. Binder IV contains "an output report from the WIP system" that is 654 pages long and contains 22,846 line items. Tr. at 181–82; *see also* Tr. at 35; PX 2D. This report lists all of the maintenance work performed under the contract, displayed using fields which classify each item as either O & A; the repair of routine, normal wear and tear ("RNWT") under the fixed fee portion of the contract; or not applicable ("N/A") to O & A for some other reason, such as having been separately reimbursed. *See* Tr. at 192, 196, 563. Each line identifies the vehicle worked upon, the relevant work order, and a description of the work. Tr. at 184, 191, 196–98; *see, e.g.,* PX 2D at 297 (containing work items for the vehicle with registration number 88C00147). When the item involves a mechanic's labor, his employee number, pay rate, hours billed and hours adjusted to reflect the 80% productivity rate are displayed. Tr. at 182–83, 195, 199, 204–07; *see, e.g.,* PX 2D at 297, line 10364 (identifying one hour of work by employee number 32040, at a rate of $21.02 per hour, which cost Fleetpro $26.27 and was classified RNWT). When the item concerned the replacement of a part, the part is identified, the quantity and cost is displayed, and the sales slip number is given. Tr. at 199, 202–03; *see* PX 2D at 297, line 10386 (identifying a pressure hose costing $25.49, from sales slip number SS 9182, that was classified O & A). Another column identifies the mile or kilometer reading of the vehicle's odometer at the time the relevant work order was opened. Tr. at 185. These numbers can be verified by consulting the vehicle summary for each vehicle, contained in Binder III. Tr. at 187–88; PX 2C, Tab 141. And another column, entitled "See Line," cross-references related items by line number. Tr. at 192–93. Inspections and work contracted out are also identified, along with the corresponding costs. Tr. at 194–95, 211–

12; *see* PX 2D at 589, line 20584 (identifying O & A work done by contractor, costing $189.48).

The individual entries in Binder IV were supported by paper documentation, such as purchase orders, parts invoices, sales slips, time cards and other payroll data. Tr. at 38–39, 201, 203, 213–14. Twenty-seven boxes containing roughly 150,000 pages of source material were present in the courtroom during the trial, providing defendant and the Court with the opportunity to seek the verification of any item contained in Binder IV. *See* Tr. at 38–42. These materials were also available to the DCAA auditors, and produced during discovery. Tr. at 40, 283, 385–86. These boxes were identified as PX 3, but it was not necessary that they be placed into the record. Tr. at 41–42. The labor and parts costs could also be verified using OL-VIMS, but that database did not contain the detail that would allow specific parts to be identified and allow items to be cross-referenced. Tr. at 199–200, 566. As was noted above, Fleetpro was not allowed to use OL-VIMS to identify O & A work. *See* Tr. at 113, 248, 526–27. And Mr. Farcosky testified that the development of the WIP database allowed three office staff to do work that would have required fifteen people, if papers from the files containing the 563 vehicle jackets had to be constantly consulted. Tr. at 170–71.

Mister Farcosky explained how the individual line items of identified O & A work added together to derive the bulk of the direct costs of performing repairs on the inherited maintenance backlog. He related that 7,610.8 hours of mechanics' logged time were devoted to O & A work, which translates into 9,513.5 total mechanics' payroll hours (since logged time is 80% of the total hours worked). *See* Tr. at 210–11; PX 2D at 654. This resulted in $199,381.94 of direct mechanics' time spent on O & A work. Tr. at 211; PX 2D at 654. All of the parts that were purchased and installed to make O & A repairs totaled $98,107.83. Tr. at 211; PX 2D at 654. And Fleetpro spent $20,432.36 on O & A work that it subcontracted out to vendors. Tr. at 211–12; PX 2D at 654. Mister Farcosky further explained that the over-

time worked by Fleetpro's mechanics was attributed to O & A work based on the ratio of O & A hours to total hours. Tr. at 232–38; *see* PX 2A, Tab B & Tab P at P–2–3. He described how the time spent by maintenance support staff relating to the O & A determinations and repairs was tracked and calculated. Tr. at 238–46; *see* PX 2A, Tab E & Tab P at P–5–6. Employees who worked on both O & A and regular contract work segregated their time using different payroll clocks. Tr. at 241–42. And the time periods when Fleetpro employees, such as Mr. Kilchenstein, who were not initially assigned to work on the Peterson AFB contract but nevertheless were diverted to assist in the O & A efforts are calculated and included. Tr. at 246–52; *see* PX 2A, Tab E. Fleetpro also utilized temporary staffing agency employees to sort and organize files, and paid Mr. Budge as a consultant to work on identifying the O & A repairs and to audit the resulting determinations. Tr. at 252–60; *see* PX 2A, Tab E; PX 5. And the costs associated with drivers who transported vehicles to be worked on by outside contractors were included, based on the ratio of outside contractor expenses for O & A work to the total expenses of work using outside contractors. Tr. at 261–64; *see* PX 2A, Tab F, Tab H, Tab P at P–7–8.

In addition to the repair parts and repair contracts costs that were associated with identified O & A work, Fleetpro also seeks recovery of a portion of other direct costs incurred in repairing vehicles. Mister Farcosky explained that the costs of repair materials bought in bulk such as paint, sealant, and grease, Tr. at 361–63; of shop supplies like detergent, other cleaning materials, tarps and welding supplies, Tr. at 364; of uniforms, rags, and safety shoes, Tr. at 364–65; and of office supplies such as paper, pens, and toner, were apportioned to the O & A work. Tr. at 367–68. These costs were prorated according to the percentage of mechanics' labor hours dedicated to O & A work, rather than the higher percentage of the cost of parts used for O & A. Tr. at 363; *see* PX 2A, Tab I, Tab P at P–8–10. Fleetpro also calculated a prorated share of the expenses for long-distance telephone calls, postage and shipping, and travel, lodging and

per diem of employees not based in Colorado. Tr. at 387–89. The percentage of mechanics' labor hours that were dedicated to O & A was again used to apportion these expenses, and the travel expense was reduced to reflect a separate reimbursement. Tr. at 388; *see* PX 2A, Tab J, Tab P at P–10–11. Mister Farcosky explained how the costs to develop and deploy the WIP database were calculated. Tr. at 389–91; *see* PX 2A, Tab K, Tab P at P–11–12. He went through the various costs associated with assembling the REA, which were not initially requested at the direction of Tecom but were included in the amended REA. Tr. at 224, 412–22; PX 2A, Tab N, Tab P at P–13; PX 2F at B–1. And he explained how the corporate general and administrative ("G & A") and profit percentages were calculated, Tr. at 225–26, 422–24, 433–37, 451–53, and how various adjustments and credits were applied to reduce the total requested. Tr. at 424–27.

Mister Farcosky also described the DCAA audits of Fleetpro's REA. Tr. at 264–84, 368–86, 395–408, 433–41, 451–53. Of the 22,846 line items in Binder IV, the auditor took a sample of 33 line items and traced back their costs to all of the source documents. *See* Tr. at 266–68, 384–85; PX 7 at SU 0055 (list of line items sampled); PX 8. For labor and material costs, the auditor identified very small questioned amounts that were below the applicable materiality criteria for reporting. *See* PX 7 at SU 0050; PX 8 at SU 0251. In the review of the category "Other Costs," the auditor looked closely at the WIP costs, Tr. at 402–07, but questioned none of them. *See* PX 9 at SU 0371. The auditor questioned one postage cost of $243, with which Fleetpro concurred and omitted from its REA. *Id.* at SU 0371–72; *see also* Tr. at 443–45; PX 2F at B–2, B–4. And the auditor questioned the inclusion of reimbursement for the CDRs in the REA. PX 9 at SU 0371–72; Tr. at 444. The auditor's initial review of Fleetpro's G & A calculation concluded that it was *too low,* and that a rate of 23.9% rather than 16.1% should be used. Tr. at 436–37; PX 10. As a consequence, the audit resulted in a determination that Fleetpro's O & A costs were understated by $29,771. Tr. at 440; PX 11. After Tecom submitted the amended REA, which eliminated the ques-

tioned postage cost, added the REA preparation costs, and incorporated the DCAA-recommended G & A rate, the Air Force asked for a second audit of Fleetpro's G & A. *See* Tr. at 442–451; PX 12. As a result of the second audit, the DCAA determined that Fleetpro's G & A rate should be slightly reduced, from 23.86 % to 23.51 percent. Tr. at 452–53; PX 12 at 2. Fleetpro does not dispute this reduction, and adjusted its claim accordingly. Tr. at 453, 456; PX 13.

In addition to the DCAA audit, repair costs that Mr. Farcosky was asked about during cross-examination seemed to confirm the general accuracy of the O & A determinations. One concerned an invoice to reimburse Fleetpro for $2,736.26 in repairs to an Eagle Coach by an outside vendor. Tr. at 520–21; DX 115. In Binder IV, this repair is classified as not applicable to O & A. *See* PX 2D at 36 (line 1243). A second invoice requests reimbursement for outside contractor repairs on two other Eagle Coaches, in the amounts of $12,024.05 and $2,288.51. See Tr. at 522; DX at 125. These repairs were classified as not applicable to O & A. *See* PX 2D at 38 (lines 1299 & 1300), 124 (line 4314). Another invoice sought reimbursement of $751.08, due to operator abuse, for the replacement of three bald tires on a bucket truck. *See* Tr. at 523–25, 560–63; DX 102. This repair was also classified as not applicable to O & A. *See* PX 2D at 307 (lines 10713–14, 10716, 10718–19); Tr. at 525–26, 563. It was only for the least costly item that was brought to Mr. Farcosky's attention—reimbursement of $195.88 for costs associated with the repair of a windshield cracked due to operator abuse—that there appears the possibility that a claimed O & A cost was separately reimbursed. *See* Tr. at 522–23; DX 122 at 122–122.6; PX 2D at 54 (line 1864 showing an O & A outside contractor expense of $207.64 relating to a windshield).

### 2. *John R. Gilchrist*

John R. Gilchrist, now retired but formerly the Executive Vice President of Tecom, also testified for plaintiff. Tr. at 605–06. Mister Gilchrist's responsibilities with Tecom included overseeing the company's vehicle maintenance contracts. Tr. at 606, 608. He was

employed as an officer of Tecom for eleven years, and prior to that was an officer for seven years with a firm that provided contract services for the General Services Administration ("GSA"). Tr. at 607. Mister Gilchrist oversaw the vehicle maintenance subcontract performed by Fleetpro at the Peterson AFB Complex. Tr. at 609. He corroborated Mr. Farcosky's account that Air Force representatives informed them that Fleetpro could seek compensation for the over and above work by "aggregat[ing] its costs" and submitting the costs "after the contract year was over." Tr. at 614.

Mister Gilchrist explained that the 5.5 % G & A figure used for Tecom in the REA was derived from its average general administrative expenses incurred in processing and handling contracts for that year, and that this figure was audited by the DCAA. Tr. at 617. He also testified that the ten percent fee included in the REA as its profit on the subcontract was considered fair and reasonable by the Federal Acquisition Regulations ("FAR"). Tr. at 617–18.[11]

### 3.  John R. McCowen

John R. McCowen was retired from the Air Force, and under contract with the government to consult on this case. Tr. at 695. While working for the Air Force he was a quality assurance evaluator for the Tecom contract. *Id.* Pursuant to his consultant contract, Mr. McCowen was tasked with reviewing Binders IV and V of the REA to look for inconsistencies. *Id.* When he was employed at Peterson AFB, he also reviewed the Fleetpro repair and cost information and reported his view of their validity. *Id.* He compared the plaintiff's claims in the REA with OLVIMS data and other original documents. *Id.* at 697.

In the Air Force, Mr. McCowen received training in vehicle maintenance and served four years as a mechanic. Tr. at 699–700. He later received training in maintenance control and analysis ("MC & A"). Tr. at 699–701. He served ten years as an MC & A analyst, during which time he continued to do mechanic's work and used OLVIMS as a management tool to control scheduling. Tr. at 700–02. Mister McCowen was involved with OLVIMS from its inception in 1985 and utilized it daily for a decade. Tr. at 704. One year after becoming a QAE, he was assigned to Peterson AFB, and became QAE for its vehicle fleet in July 1996. Tr. at 703. He served as a QAE until he retired in 2000. Tr. at 705.

Under the vehicle maintenance portion of the contract, it was the contractor's responsibility to make sure that the maintenance information was entered into OLVIMS. Tr. at 706. Mister McCowen explained the process by which repairs were performed and documented at Peterson AFB. Minor maintenance, which was work taking less than two hours, was done without admitting the vehicle to the shop and a work order was not generated. *Id.* These repairs were documented on the "1800 card" used by the operator in his daily inspections, which remained with the vehicle. Tr. at 707. When a vehicle needed more than minor maintenance, an "incoming QC" employee wrote up a description of the problem requiring the maintenance and of any other obvious problems and sent this to maintenance control, which then produced a full work order. *Id.* When an MC & A officer created the work order, he or she checked to see the date of the vehicle's next regularly scheduled maintenance. Tr. at 708. If maintenance was due within a certain period of time the MC & A officer added that to the work order in OLVIMS. *Id.* The MC & A officer also checked for delayed maintenance, and might have added that work to the work order, if it concerned a severe defect or a part that was already completed. Tr. at 709–10. Mister McCowen noted that one requirement the maintenance contractor had to meet was that parts that were completed and ready for installation had to be installed within 90 days. Tr. at 710.

---

11. It is not clear to the Court which FAR provision Mr. Gilchrist intended to reference. Perhaps due to his experience with GSA contracts, he was referring to the General Services Acquisition Regulation governing commissions on equitable adjustments involving subcontractor work. *See* 48 C.F.R. § 552.243–71; *North American Constr. Corp. v. United States,* 56 Fed.Cl. 73, 74–75 (2003).

Eventually this process resulted in a generated work order that was given to the mechanic who was to perform maintenance on the vehicle. Tr. at 711. The mechanic completed that work and any additional repairs he discovered were needed while he performed maintenance, and added the additional repairs to the work order. *Id.* The mechanic would enter on the work order his employee number and the number of hours worked. Tr. at 711–12. The receipts for any parts used during the repairs would be attached to the work order. *Id.* The mechanic then brought the vehicle to the "ready line" and gave the work order to the outgoing QC officer for the contractor. Tr. at 713. After the work was verified, the work order was returned to the MC & A officer who closed the work order in OLVIMS and contacted the Air Force QAE for the government's inspection of the work. *Id.*

As a QAE for the Peterson AFB vehicle fleet, Mr. McCowen was responsible for evaluating the contractor's performance of six categories of "required service," or "RS," such as whether or not VOC rates were exceeded or parts were installed within 90 days of receipt. Tr. at 715–17; *see* PX 1 at 116–20 (RS–13, RS–15, RS–16, and RS–18–20). This evaluation was done by reviewing the OLVIMS documentation for a random sampling of the vehicles maintained, unless the lot size was small enough to warrant inspecting the documentation for 100 percent of the vehicles. Tr. at 715, 717, 719. On some occasions he reviewed the documentation for more vehicles than were contained in the prescribed sample but would rate performance on just a smaller, random subset. Tr. at 718. He testified that when he found numerous defects that were not associated with the vehicles in his sample he informed his boss, the FAC, and the contractor of these even though they did not figure in his CDR determination. Tr. at 721–22. He did this to eliminate the possibility that he would find those same deficiencies during his next evaluation if those vehicles were included in the following month's sample. Tr. at 722.

This gave the contractor an opportunity to fix all the deficiencies and to avoid a negative report in future months. *Id.*

Mister McCowen testified that for the items he evaluated, LB & B's performance of required service was acceptable. Tr. at 732. He explained that, for purposes of evaluating whether or not the vehicle maintenance contractor was exceeding the "total delayed hour backlog" limit from section 5.2.3.5.1 of the PWS, certain delayed code categories were excluded. Tr. at 733–34; *see* PX 1 at 85 (PWS § 5.2.3.5.1).[12] According to Mr. McCowen, delay codes referenced by the letters B, D, G, H, K, M, R and T were not included in this calculation. Tr. at 734, 737–38, 743. Code "B" meant that repairs were delayed pending a governmental decision, and the contractor would not be held responsible for that delay. Tr. at 734–35. Code "D" meant that the work had been preempted for higher priority work at the behest of the Air Force. Tr. at 735–36. Code "G" was used to delay items that the Air Force never intended to repair, for example because of their advanced age. Tr. at 736. Code "K" represented delays caused by the Air Force's need to have a vehicle available for its mission. Tr. at 736–37. Code "M" referred to vehicles involved in accidents or abuse. Tr. at 737. These vehicles were delayed because of the length of time needed in order to repair them. *Id.* Three codes, H, R, and T, were not included in determining the VOC rate for the fleet. Tr. at 743; *see* PX 2B, Tab 7 at 30 (PWS § 5.2.1). Code "H" included refuelers, trucks that distributed fuel for aircrafts, which the contractor had no responsibility to maintain. Tr. at 742–43. Mister McCowen could not remember what code "R" represented and speculated it may have been removed from the contract. Tr. at 737, 743. Code "T" referred to vehicles assigned to an organization that performed its own maintenance, removing such maintenance from the purview of the contractor. Tr. at 744.

---

**12.** The Court has already determined that the "delayed hour backlog" referenced in PWS § 5.2.3.5.1 is not the same thing as the backlog of "required maintenance actions" that entitles the contractor to over and above compensation under PWS § 5.5.1. *See* Tr. at 747; *Tecom,* 66 Fed.Cl. at 752–53.

Mister McCowen testified that the November 1996 vehicle inspections that were conducted to assess the condition of the fleet at contract turnover, once entered in OLVIMS, increased his overall delayed hours calculation "beyond any realistic use of the number." Tr. at 768. Since "L codes" were not excluded from this calculation, placing "L codes" on these items did not reduce the delayed hours total. *See id.* He testified that he was against the entry of these items into the system as L-coded, because this would "cause almost a sure, automatic failure of the delay versus back hour percentage." Tr. at 751–52. Because of the L-coded items, the backlog in December 1996 and January 1997 would not have met the RS standard. Tr. at 738–39; *see* PX 2B, Tabs 51 & 63. The L-coded items were eventually removed from OLVIMS and ceased to have an impact on the maintenance backlog calculation. Tr. at 768–769.

At one point during his testimony, Mr. McCowen was asked about a defect for which the plaintiff seeks O & A compensation, yet was subject to a "waiver" from the Air Force. Tr. at 760–61. Reviewing Binders IV and V of the REA, Mr. McCowen confirmed that the Air Force did not require the repair of a dent in vehicle number 75C00292, but the repair was made and included in the O & A calculation. *Id.* at 761; *see* PX 2D at 8, line 250; PX 2E at 14.

When questioned regarding contract discrepancy report T007, which he issued, *see* DX 81, Mr. McCowen noted that he found seven cases of vehicles that had not had their scheduled maintenance performed in a timely manner in the month of January 1997. Tr. at 774–75; *see also* DX 67. As RS–15 allowed for no defects, he rated the contractor's performance as unacceptable. Tr. at 774. Apparently, some units refused to turn in their vehicles for maintenance because of the length of time it took for the contractor to finish its work and release them. *See* DX 67. Mister McCowen explained that had the contractor followed the procedure of sending abuse letters to the relevant units concerning the vehicles—a procedure which it used in other contexts—the defect would have been excused. Tr. at 775.

Mister McCowen testified that the maintenance backlog that was inherited by the contractor when it assumed maintenance duties on December 1, 1996 was the cause of at least two contract discrepancy reports he issued for the month of February 1997. *See* Tr. at 787–88, 791. He acknowledged that CDR T010, issued because scheduled maintenance was overdue for ten vehicles in violation of RS–15, *see* DX 69; DX 84, was "[i]n a roundabout way" caused by this backlog, as "it was almost impossible for the contractor to conduct normal maintenance through the sheer magnitude of vehicles that were already there." Tr. at 787–88. And CDR T012, issued under RS–19 because the delayed backlog exceeded 25% and parts that were in inventory were not installed within 90 days, *see* DX 70; DX 86, was "related . . . directly" to the inherited backlog, "in that it's another thing that couldn't be gotten to because of the magnitude of the workload." Tr. at 791.

### 4. George E. Miller

Defendant's expert, Mr. George E. Miller, is a financial analyst who frequently consults on litigation-related matters. Tr. at 954–55, 957; *see* DX 49 at 49.18–49.21 (listing past testimony). This experience includes lost profits and lost earnings analyses, investigations "to see if the business records or economic data tend[ ] to support or contradict the story told," Tr. at 958–59, and the analysis of equitable adjustment claims for government contracts. Tr. at 957–60; DX 49 at 49.18 (explaining litigation services experience). The government engaged Mr. Miller to analyze the quantum from Tecom's REA "for reasonableness, for completeness, for accuracy, [and] for reliability." Tr. at 955. The focus of his testimony was the "reasonableness" of Tecom's damages claim. *See, e.g.,* Tr. at 961, 980–81, 1013–14. Mister Miller explained that he did not audit any of the expenses identified in the REA and for purposes of his analysis assumed they were incurred, and that he was not opining on contract interpretation or on the actual mechanics' work that was performed. Tr. at 966–67; *see also* DX 49 at 49.2.

Mister Miller was of the opinion that the financial data indicated that Fleetpro had either not performed all the work under the contract for which the fixed fees were paid, or was claiming a good portion of this "in-scope" work as O & A work. *See* Tr. at 987–89, 1000, 1015–16; DX 49 at 49.6–.9, 49.14–.15. He reached this conclusion by comparing the costs that he estimated Fleetpro would have incurred to perform the maintenance portion of the contract were there no excess maintenance backlog, to the costs as reflected in the REA, to determine if there were any "cost overruns." *See* Tr. at 985, 998–99, 1018–19; DX 49 at 49.7–.10. Mister Miller started his analysis by assuming that the breakdowns of the various cost categories that factored into Tecom's bid for the contract were accurate estimates of the costs of performing the work, and then modified these to account for what he believed were underestimates of labor costs. *See* Tr. at 991–93, 1002–03, 1005–06; DX 49 at 49.2, 49.10, 49.12, 49.29, 49.37.

Defendant's expert first looked at the costs of parts and materials. He noted that the bid for ten months of maintenance had estimated parts and materials costs of $220,250, or about $22,000 per month. Tr. at 970–72; *see* PX 2b, Tab 15 at 72.[13] For the six months that Fleetpro performed the contract, Mr. Miller testified that he would expect parts and materials to total $132,000, if there were no excess backlog to reduce. Tr. at 971–72. He then noted that after contract turnover, Fleetpro estimated that reducing the maintenance backlog could require more than $300,000 in parts. Tr. at 974–75, 977; *see* PX 2B, Tab 35 at 4, Tab 55 at 3; PX 4 at 1 (estimating parts costs of $317,374); DX 49 at 49.14. Fleetpro claims that the vehicle fleet was brought up to serviceability standards by the time it was terminated. Tr. at 977–78 (citing PX 2F at A–4). But the total cost of parts during the six months of contract performance was about $121,000 (not counting materials, supplies, or contracted-out work). Tr. at 981; *see* PX 2D at 654 (totaling parts costs as $120,812.06). Mister

Miller thus concluded, based on the parts figures, "that virtually no excess backlog work was done." Tr. at 981.

He then provided a more detailed look at the parts and materials figures. Tr. at 982–90; *see* DX 49 at 49.25, 49.27–49.28. According to Mr. Miller's calculations, based on Fleetpro's bid, $130,350 would have been expected to have been spent over six months on parts and materials in performing within the scope of the contract, and another $24,700 in parts and materials was purchased under Modification P00001 (to reduce the severe safety defects backlog). *See* Tr. at 983–84; DX 49 at 49.25, 49.27; *see also* DX 131 at 2. But the actual total cost of parts and materials was less than this, at just over $145,304. *See* Tr. at 984; DX 49 at 49.25 (Schedule A). When Mr. Miller added other direct costs to the mix, his estimated expected costs, under the bid and the modification, totaled $161,050, but the actual total was just $161,897. *See* Tr. at 986–87; DX 49 at 49.27–49.28. Because his calculations do not show any overrun, Mr. Miller concluded that Fleetpro is "double-counting" parts and materials as O & A when it already received compensation for them under the fixed fee contract payments. Tr. at 987.

Mister Miller made similar calculations regarding Fleetpro's labor costs. Tr. at 990–1006. He first estimated the expected number of mechanics' hours based on the positions listed in Fleetpro's bid. Tr. at 991; *see* DX 49 at 49.29 (Schedule C); PX 2B, Tab 15 at 73. Based on his calculations, the mechanics would have worked 655 hours in each two-week pay period, or 8,518 hours in total. DX 49 at 49.30 (Schedule C.1). To this he added 1,062 hours he estimated were performed under the contract modification, and the hours of inherited backlog that were not excess, adjusted upwards based on the 80% productivity rate.[14] *Id.* He then compared this number to the total number of mechanics' hours that he derived from a review of Fleetpro's ADP payroll records, and found

---

**13.** When citing to the document found behind Tab 15 of Binder II, the Court will follow the convention of using the page number printed on the bottom of the particular page cited.

**14.** For the non-O & A backlog number, he used 345 hours of logged labor rather than 355 hours. *See* DX 49 at 49.9 n. 15.

that there were "3,824 mechanic hours over and above the bid." Tr. at 999; DX 49 at 49.30. Based on the average mechanic labor rate, this translated into "$71,322 in total overrun for mechanics." Tr. at 999; DX 49 at 49.30. Mister Miller opined that this is the "ceiling" on increased mechanics' labor to reduce the maintenance backlog. Tr. at 999.

Defendant's expert then modified his estimate of the mechanics' labor costs of performing the in-scope contract work. He noted that a Fleetpro memorandum dated January 12, 1997 indicated that because the Air Force would not fund "the 'get-well' fleet repair program," the company was "to return to the contract specified staffing levels" by terminating six employees. Tr. at 992; PX 2B, Tab 57. Based on this, Mr. Miller deduced that the staffing level for the next three pay periods reflected the specified staffing level under the contract, before additional mechanics were rehired. Tr. at 993–95; see DX 49 at 49.29. As modified, Mr. Miller's calculation for mechanics' labor showed that 11,411 hours were expected to perform the contract requirements, the non-O & A backlog, and to reduce the severe safety repairs backlog. See DX 49.31 (Schedule C.2). This resulted in 2,424 hours over what Mr. Miller believed was the contract specified amount, and a cost "overrun" of $45,212. See id.; Tr. at 1002–03.

Mister Miller also analyzed non-mechanics' time, and found an "overrun" of about $128,000 compared to what he believed was the Fleetpro bid. Tr. at 1004–06; DX 49 at 49.38 (Schedule E.1). But based on the level of non-mechanic staff for the same three pay periods that he used to determine the contract-specified staffing level for mechanics, he concluded that there was virtually no overrun. See Tr. at 1005–06; DX 49 at 49.37 (Schedule E), 49.39 (Schedule E.2, showing an overrun of $7,232). Defendant's expert then looked at the ratios between mechanic hours, non-mechanic hours, and direct costs (composed of parts, materials, and other direct costs), under his estimates of Fleetpro's bid plus those required by the contract modification, and the actual figures as he calculated them. Tr. at 1006–07. He estimated that Fleetpro expected to use $16.81 in parts and

materials and spend 26 minutes of non-mechanics' time for every hour of mechanics' time worked. Tr. at 1006; DX 49 at 49.36 (Schedule D). But he calculated that for every $16.81 spent on parts and materials, Fleetpro actually incurred an hour and 26 minutes of mechanics' labor and an hour and 12 minutes of non-mechanic time. Tr. at 1006; DX 49 at 49.36. Mister Miller opined that if "a lot of excess backlog work" had been done, there would have been cost overruns in parts and mechanics' labor, but instead, "to the extent there's a cost overrun on this contract, it's mostly in the non-mechanic time." Tr. at 1007–08. He concluded that the non-mechanics' overrun was the consequence of "underbidding," see DX 49 at 49.12, and that the mechanics' "labor overrun is attributable to Fleetpro's lack of productivity." Id. at 49.10.

Defendant's expert testified that he believed Tecom erred in not subtracting the compensation received for performing Modification P00001 before the Fleetpro G & A and profit were calculated. Tr. at 1010–12. Mister Miller believed that the contract change order included a payment for the overhead and profit associated with performing the severe safety backlog work, see PX 2B, Tab 55, and that the costs net of these two adjustments should be subtracted from the claim before applying the higher G & A and profit rates requested by the subcontractor. Tr. at 1011–12. Placing the credit for the modification costs above the Fleetpro G & A and profit calculation would reduce the claim by approximately $31,000. Tr. at 1012.

Mister Miller's final "reasonableness test" was based on what he termed "the big picture." Tr. at 1013–14. Using the information in the REA, he calculated Fleetpro's total cost of performing the maintenance work—which did not include REA preparation costs and the G & A and fees of Fleetpro and Tecom. See Tr. at 1014–16. He determined that the total cost was $728,646. Tr. at 1015. Defendant's expert then took Fleetpro's bid costs, less G & A and profit, and prorated these over six months, deriving what he described as a "credit for previous billing on the fixed-price contract." See Tr. at 1015. He subtracted this derived figure,

as well as the credits acknowledged by plaintiff, from the total cost figure and determined that "the total cost overrun is $237,156." Mister Miller separately calculated Fleetpro's claimed O & A costs, again, not including REA preparation costs and the G & A and fees of Fleetpro and Tecom, and determined these totaled $465,000. *See* Tr. at 1015–16. He concluded that Fleetpro's "description of over and above is well in excess of the total cost overrun on the contract." Tr. at 1015. Mister Miller then opined that "the government tends to not like total cost claims because the concern is they overstate a claim," and that since Fleetpro's method of calculating O & A "comes up with an amount far in excess of the total cost overrun on the contract," he thought "one can reasonably conclude that the over-and-above classifications are wrong." Tr. at 1016.

On cross-examination, Mr. Miller admitted that he had not read the provisions of the contract concerning over and above maintenance work. Tr. at 1019–20, 1042. He acknowledged that he did not assume that estimates contained in bids were binding. Tr. at 1020. He stated that he had no opinion as to whether any maintenance backlog in excess of 355 labor hours existed at Peterson AFB on December 1, 1996. Tr. at 1023. Mister Miller opined that parts which Fleetpro classified as O & A were "invoic[ed] under the fixed-price portion of the contract as regular repair and maintenance," but then conceded that no parts were mentioned in the invoices. Tr. at 1025. And based on Fleetpro's bid, Mr. Miller stated his belief that the company expected to earn just $7,193 in profits while incurring $719,304 in costs over ten months. Tr. at 1028–29; *see* PX 2B, Tab 15 at 72. He then acknowledged that Fleetpro hoped to earn additional profits due to labor efficiency. Tr. at 1029.

When asked if he could identify any line item from Binder IV that misidentified a cost of performing O & A work, Mr. Miller admitted he could not, explaining that his analysis was based on an "aggregate." Tr. at 1041–43. Concerning the discrepancy between plaintiff's calculation of total mechanics' labor hours, which was 15,040.6, *see* PX 2D at 654, and his own calculation of 13,836, *see* DX 49

at 49.30, Mr. Miller explained that he did not try to reconcile the line items in Binder IV with his calculations based on the payroll records, as he was not able to match all the employee identification numbers contained in the REA with the actual employees. Tr. at 1045–48. Mister Miller acknowledged that one individual with logged mechanics' time in Binder IV, Norbert Karchefski, was classified as a non-mechanic in his calculations. Tr. at 1049–51. He explained that if he had understated the "mechanic overrun," this was offset by an overstatement of the "non-mechanic overrun." Tr. at 1052. Mister Miller also conceded that his conclusion that Fleetpro's employees were inefficient was merely conjecture. *See* Tr. at 1055–56. And he stated that he had no opinion as to whether, during the pay periods he used to determine the "contract-specified staffing level" or at any time, the Fleetpro mechanics were repairing vehicle defects that existed prior to December 1, 1996. Tr. at 1057–58.

## II. DISCUSSION

### A. Methodology for Proving Damages

■ As a threshold matter, the Court addresses an unusual argument advanced by the government. The plaintiff had filed a motion *in limine* which sought to preclude Mr. Miller's testimony, on the ground that he employed the disfavored "total cost" approach to analyze Tecom's damages claim. *See* Pl.'s Mot. in Lim. at 1–6. Apparently believing that turnabout is fair play, the government in its post-trial brief argues that the *plaintiff* is the one advancing a variation of the total cost method, and then spends considerable space attempting to show that the preconditions for use of this method have not been met. *See* Def.'s Post–Trial Br. at 6–12. Defendant's argument on this point is without warrant.

■ As both parties recognize, *see* Def.'s Post–Trial Br. at 7–8; Pl.'s Mot. in Lim. at 4, the total cost approach is disfavored. *See Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861–62 (Fed.Cir.1991) (describing the method as "a last resort" that may be used "in those extraordinary circumstances where no other way to compute damages was

feasible"); *WRB Corp. v. United States,* 183 Ct.Cl. 409, 426 (1968) (explaining this method "has been tolerated only when no other mode was available"). The Federal Circuit has explained that "the preferred way for a contractor to prove increased costs" due to a breach or constructive change is by submitting actual cost data for the additional work. *Propellex Corp. v. Brownlee,* 342 F.3d 1335, 1338 (Fed.Cir.2003). When the actual costs corresponding to the additional work cannot be directly identified, courts may allow the total cost method to be used. *See Servidone,* 931 F.2d at 861–62. Under this method, the contractor's bid is subtracted from the total costs incurred in performing the contract. *Propellex,* 342 F.3d at 1339. The danger in using this approach is that it may provide " 'a windfall for either the government or the contractor,' " *id.* at 1338 (citation omitted), depending on whether the contractor underestimated or overestimated the costs of performing the in-scope work under the contract.

■ The total cost method may be used only when a plaintiff can demonstrate that: (1) it is impractical to prove the actual losses; (2) the bid was reasonable; (3) the actual costs were reasonable; and (4) the plaintiff is not responsible for the additional costs. *Id.* at 1399 (citing *Servidone,* 931 F.2d at 861). A "modified total cost method" entails adjusting the total cost method to address deficiencies in the contractor's proof, such as adjusting the bid upwards to correct for any understatement or excluding costs that were the contractor's responsibility. *Id.* Under either formulation, the damages associated with additional work are indirectly derived. The formula starts with costs in the aggregate, from which is subtracted the estimated cost of performing the contract (based on the original or an adjusted bid). *See id.* Under a modified approach, costs that can be identified as unrelated to the additional work may also be subtracted. *Id.* Once these costs are subtracted from the costs in the aggregate, whatever is left is assumed to have been the result of the breach or constructive change.

■ The methodology for proving damages used by plaintiff in this case does not at all resemble the total cost or modified total cost method. Rather than derive its damages in an indirect fashion, Fleetpro very carefully and painstakingly identified the actual costs associated with every specific maintenance job performed on the fleet, information which was accumulated in a document containing 22,846 different line items. *See* PX 2D. Plaintiff did not take an aggregate of costs and subtract from it the estimated costs of performing the regular work under the contract, but rather identified each and every maintenance action which addressed a defect that it determined existed before December 1, 1996. *See* Tr. at 153–84. Many of these defects had been identified before Tecom assumed the contract, in the November 1996 joint assessments. *See* Tr. at 153–55; *see also* PX 2B, Tab 43; PX 2C, Tab 142. But the joint assessments often identified problems requiring further inspection and analysis, and the Air Force did not allow the entire fleet to be assessed prior to contract turnover. *See* Tr. at 61–62, 153–54. The government acknowledges that because it stopped the joint assessments before all of the vehicles had been assessed, "it is impossible to determine with complete accuracy the amount of backlog maintenance that existed on December 1, 1996." Def.'s Post–Trial Br. at 6. But from this, it oddly reasons that since Fleetpro was forced by the government's own actions to have to identify defects which preexisted contract turnover "after-the-fact," this means that plaintiff used a "modified total cost method of proving damages." *Id.* at 7. The government seems to misunderstand the modified total cost method. It does not turn on whether additional work that was performed was identified as such before– or after-the-fact; to the contrary, it entails *not identifying* the direct costs of the additional work. *See Servidone,* 931 F.2d at 861. Plaintiff did identify both the additional work and its actual costs. The government's claim that plaintiff is attempting to prove damages under a modified total cost approach is simply incorrect.

As was discussed above, a total cost approach was used by the government's expert as a "reasonableness test" for plaintiff's damages claims. *See* Tr. at 1013–16. Mister Miller argued that the ceiling on damages

due to the government's breach was the sum of cost "overruns" for labor and materials, which he calculated with reference to the amounts contained in the bid. *See* Tr. at 986–87, 990–1006, 1014–16; *see also* Def.'s Post–Trial Br. at 17–18. In so doing, Mr. Miller thought he was being conservative, under the assumption that "the government tends not to like total cost claims because the concern is they overstate a claim." Tr. at 1016. But in fact, the total cost method may provide a windfall for either party, and that is why the actual costs approach is preferred. *See Propellex*, 342 F.3d at 1338. Mister Miller followed this disfavored approach, focusing solely on the aggregate, and made no attempt to refute the actual costs that plaintiff claims were incurred in performing O & A work. Tr. at 966–67, 1041–43. He admitted that he had not read the provision of the contract entitling plaintiff to compensation for reducing the excess maintenance backlog. Tr. at 1019–20, 1042. He analyzed plaintiff's damages claims as if this clause provided for compensation only to the extent that costs exceeded the amounts estimated in the bid. But whether the costs of performing the regular, in-scope work of the contract were more or were less than the bid breakdowns is utterly irrelevant to the compensation for O & A work required by the contract, which provided that if an excess maintenance backlog were found, "the incoming contractor shall reduce this backlog and will be compensated for this initial reduction [in accordance with] the over and above hourly rate and material costs." PX 1 at 88 (PWS ¶ 5.5.1). This provision makes no reference to bid amounts or to any notion of cost overruns. As Mr. Miller used the disfavored total cost method of analysis, and was not familiar with the clause of the contract specifying compensation for O & A work, the Court gives his testimony little weight.

**B. Findings of Fact and Conclusions of Law**

The Court finds that plaintiff, through the convincing testimony of Mr. Farcosky, Fleetpro's president, has sufficiently established the size of the maintenance backlog that was inherited as of December 1, 1996, and the costs associated with its reduction. Some vehicle defects were unquestionably identified in the joint assessments that occurred in November 1996. Tr. at 153–55; *see also* PX 2B, Tab 43; PX 2C, Tab 142. To these were added the defects that were subsequently identified by Fleetpro personnel on the basis of parts found to be in a condition so far below the serviceable standard that this could not have occurred since contract turnover, given the small amount of miles the vehicles had been driven. Tr. at 155–66. These preexisting defects were identified with Mr. Farcosky's personal involvement and at his direction, and followed standards he developed in his years of preventative maintenance experience. Tr. at 155–59, 161. Other preexisting defects were found from a closer inspection of defects already identified, or were logically deduced from the frequency of related repairs. *See* Tr. at 153–54, 167–69. The process and methodology followed were amply explained and supported by Mr. Farcosky's testimony and the REA, *see* Tr. 153–84; PX 2A at 17–20, and the resulting "Work Classification" binder very specifically and carefully details the work that was O & A. *See* PX 2D. Plaintiff had available in the courtroom all of the support documentation underlying the REA, including payroll records, purchase orders and parts invoices. Tr. at 38–39, 201, 203, 213–14.

The government argues that Mr. Farcosky's testimony "should be discounted as self-serving at best," and that an independent expert should have testified concerning the determination of pre-December 1, 1996 vehicle defects. Def.'s Post–Trial Br. at 10. But Mr. Farcosky personally participated in the identification process and was a member of the team that performed the final review of the results. Tr. at 158–59, 161, 173–75, 178–81. The testimony concerned his personal knowledge, and his routine work experience. Moreover, he was available for cross-examination on the method used to determine whether a defect was preexisting, and could have been questioned about the manner in which any—or, indeed, *every*— determination was made. And the government concedes that the process of identifying these defects after contract turnover was necessitated by its decision to stop the joint

assessment of the fleet before every vehicle was inspected. Def.'s Post–Trial Br. at 6. While complete accuracy may be impossible as a result, " '[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertained with absolute exactness or mathematical precision.' " *Hi– Shear Tech. Corp. v. United States,* 53 Fed. Cl. 420, 436 (2002) (quoting *Elec. and Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969)).

Notwithstanding the difficulties caused by the size of the backlog, *see* Tr. at 135, the shortcomings of the OLVIMS system, *see* Tr. at 115–16, and the restrictions on use of the system imposed by the Air Force, *see* Tr. at 526–27, plaintiff managed to identify the direct costs associated with reducing this backlog with more than sufficient precision. The primary direct costs—labor, parts, and contracted-out work—were carefully documented in Binder IV, using 22,846 individual lines of information. PX 2D. Other direct costs, such as repair materials, shop and office supplies, and uniforms, were also reasonably estimated based on the percentage of related work (either mechanics' labor hours or contracted-out work) that were identified in Binder IV as O & A. *See* PX 2A, Tabs E, F, I. The Court finds that the communications, travel and supervision costs were also reasonably apportioned to the O & A. *See* PX 2A, Tab J. Some added comfort is also derived from the DCAA audits, which confirmed the accuracy of the REA figures. *See* PX 7–12.

■ The government argues that because the contract provision it breached regarding a maintenance backlog describes the compensation owing to the contractor for reducing the backlog as "the over and above hourly rate and material costs as verified by invoices input into the OLVIMS," the contractor can receive only this and no more. *See* Def.'s Post–Trial Br. at 14–17; PX 1 at 88 (PWS ¶ 5.5.1). But whether the government's liability is determined as the result of a constructive change requiring an equitable adjustment, or as a breach of this contract provision, costs other than labor, parts, and repair materials are recoverable. Under PWS ¶ 5.5.1, the government promised it would not require more than 355 labor hours' of inherited maintenance work to be performed, unless it paid special compensation to the contractor. But more than twenty times this amount was required of Tecom's subcontractor. *See* PX 2D at 654 (showing mechanics' O & A labor hours, as logged in the system, totaling 7,610.8). The Air Force required this work to be performed, but paid only two weeks' worth of special compensation. *See* DX 131. The direct and proximate result of this breach, and the consequence of the expansion in work beyond the requirements of the contract, were reflected in costs beyond mechanics' labor, parts and repair materials.

Plaintiff's actual cost data shows that over 63% of Fleetpro's mechanics' hours were spent reducing the inherited maintenance backlog. *See* PX 2D at 654; PX 2A, Tab A. Since PWS ¶ 5.5.1 promised that such backlog work (in excess of 355 hours' worth) would not be required absent the payment of special compensation, to the extent any of this work was performed without the specified compensation, the provision was breached. The breach was in the requirement of the work as much as in the failure to pay the special compensation, as PWS ¶ 5.5.1 promised a certain limit to the amount of inherited repairs that the contractor could be ordered to perform in the ordinary course.

Fleetpro's massive effort necessarily required the use of more office and shop supplies, and these are compensable regardless of whether they would be considered "material costs" which could have been entered into OLVIMS. Moreover, the tremendous amount of repair work that was needed as of December 1, 1996 caused problems that could not be solved using the OLVIMS system, and resulted in the Air Force requiring reports that could not be generated using OLVIMS. *See* Tr. at 115–16, 124–25, 135–37. Fleetpro developed the WIP database to overcome the problems caused by the maintenance backlog it was required to reduce, and to identify the O & A repairs that the Air Force would not allow to be tracked in OLVIMS. Tr. at 526–27, 545–49. The costs

of developing and using the WIP database thus were incurred as a direct result of the government's breach of contract.

The massive backlog that Fleetpro was required to reduce also consumed the time and attention of many non-mechanics, including Fleetpro employees not stationed in Colorado. *See* Tr. at 246–52; PX 2A, Tab E. These costs, too, were directly caused by the breach. The contractor and subcontractor were told by the Air Force to perform the repair work on the maintenance backlog without special compensation, and to submit invoices for equitable adjustments later. Tr. at 148–50, 614; *see also* PX 2B, Tab 61 at 4. The costs of assembling the REA were thus incurred for purposes of contract administration, and resulted directly from the breach. These, too, would be recoverable. *See Bill Strong Enters. v. Shannon*, 49 F.3d 1541, 1549–50 (Fed.Cir.1995); *SAB Constr., Inc. v. United States*, 66 Fed.Cl. 77, 90–91 (Fed.Cl. 2005); *see also* Def.'s Post–Trial Br. at 5 n. 4 (conceding that these costs are "ordinarily recoverable"). And the government's own witness conceded that some contract discrepancy reports, which resulted in deductions made to Fleetpro's payments, were caused by the excessive maintenance backlog that Fleetpro was required to reduce. *See* Tr. at 787–88, 791.

■ The government also contends that G & A (overhead) expenses, and a corporate fee (profit), may not be awarded because PWS ¶ 5.5.1 does not provide for it. Def.'s Post–Trial Br. at 17.[15] Defendant also criticizes (without any accompanying legal citation or argument) the prime contractor and subcontractor for seeking G & A and fees based on higher rates than were included in the bid. *See id.* at 5, 8–9. But these costs, like the others discussed above, do not have to be mentioned in the breached provision to be recoverable. Moreover, the Court does not find any reason to limit Fleetpro to the four percent G & A and one percent profit that were apparently built into the bid. *See* PX 2B, Tab 15 at 72. As Mr. Farcosky ex-

plained, the subcontractor hoped to recoup an additional margin on the contract by achieving an 80% productivity rate—which it, in fact, did achieve. Tr. at 117–18, 231–32; *see* PX 2A, Tab A. And the enormous maintenance backlog, which absorbed over 63% of its mechanics' logged time, *see* PX 2D at 654; PX 2A, Tab A, imposed costs throughout the company, justifying the recovery of Fleetpro's normal G & A which, in this case, was verified by DCAA audits. *See* PX 10, 12. The government's breach directly caused a diversion of Fleetpro's resources from its other endeavors, and thus but for the breach, the normal Fleetpro profit would have been earned on the diverted amount. *See Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001). The question of the prime contractor's G & A, however, poses a different issue, as the bid apparently did not include any G & A costs for Tecom. *See* PX 2B, Tab 15 at 71. The bid would thus seem to indicate that Tecom did not expect the work performed by the subcontractor to impact its G & A expenses and, unlike the case of the subcontractor who could profit through efficiency, there does not appear to be any mechanism by which the prime contractor could recoup more than was built into the bid. As far as Tecom's corporate fee is concerned, no case law has been brought to the Court's attention that would limit this fee to 1% profit employed in the bid. The prime contractor's willingness to accept a nominal profit for the work within the scope of the contract should not prevent it from receiving a more usual fee on top of the subcontractor's costs for the performance of additional work due to the government's breach.

To the extent defendant attempts to show that plaintiff's costs are unreasonable by identifying purported flaws in the damages calculation, *see* Def.'s Post–Trial Br. at 11–12, the Court finds that the examples fail to undermine the overall integrity of the actual costs presentation. Although the vehicle mileage that was listed in Binder IV for one

**15.** The government also makes the argument that since the maintenance contract was for a firm-fixed price, the contractor assumed the risk that the workload would exceed that specified. Def.'s Post–Trial Br. at 13–14. But this argument can-

not be squared with the express provision of the contact entitling the contractor to *more* than the fixed amount if a maintenance backlog exceeding a certain size needed to be reduced. *See* PX 1 at 88 (PWS ¶ 5.5.1).

vehicle was incorrect, this would have had no bearing on the O & A determination relating to that vehicle, for it was actually one of the vehicles jointly inspected in November 1996. *See* Tr. at 186 (discussing vehicle number 88C00147); PX 2C, Tab 141 at 47. The government alleges that Binder IV purports that a mechanic performed repairs three weeks after he was terminated. *See* Def.'s Post–Trial Br. at 12; Tr. at 1064–67 (discussing Mr. Norbert Karchefski); DX 49 at 49.32; PX 2D at 10 (line 322). But as Mr. Farcosky explained, Tr. at 185, 187, and defendant's expert acknowledged, Tr. 1059, the entry in the date column may have been the date the work order was completed and not the date of each item of work performed. Moreover, defendant had the opportunity to ask Mr. Farcosky to produce the payroll records and other supporting documentation relating to this entry, but did not do so.

Defendant also points to work to repair flat tires for a bucket truck, which was classified as O & A, although Fleetpro was reimbursed for three tires bought for the truck due to operator abuse. Def.'s Post–Trial Br. at 12. But this hardly shows "that Fleetpro is attempting to be paid twice for the same work," *id.*, as such trucks have more than four wheels (and presumably use spares and seasonal tires), and the three tires for which Fleetpro was separately reimbursed are identified in Binder IV as not applicable to the O & A calculation. *See* PX 2D at 307 (lines 10714 & 10719). For another vehicle, the government contends that the replacement of a battery cable three months after the battery was replaced shows the cable did not need repairing in January 1997 and thus could not be O & A. Def.'s Post–Trial Br. at 12; *see* PX 2D at 425 (lines 14852 & 14872). But the battery cable entry references a November 15, 1996 inspection. *See* PX 2D at 425 (line 14872, cross-referencing line 14841). All told, the government only identifies one O & A item—$207.64 for the replacement of a cracked windshield, *see* PX 2D at 54 (line 1864)—which might have been an error. *See* DX 122.

Finally, the government argues that its expert has demonstrated that plaintiff "did not experience any fixed-fee cost overruns."

Def.'s Post–Trial Br. at 17 (citing Tr. 954–1016; DX 49). As was discussed above, the Court gives little weight to Mr. Miller's testimony. He used the disfavored total costs method, and failed to realize that the method can produce windfalls for the government as well as the contractor. *See* Tr. at 1016. As a simple example, a contractor can bid $100,000 to perform certain work, incur $70,000 in costs to perform additional work outside the scope of the contract due to a breach or constructive change, and efficiently perform the contract work at a cost of $20,000. Such a contractor should not be penalized for his efficiency, yet that is what Mr. Miller proposed. Moreover, his "double-counting" analysis was based on the fiction that the invoices for the fixed fee amounts under the contract somehow incorporate the parts and labor costs incurred in performing the contract, when in fact there is no relation between them. *See* Tr. at 987, 1025. And Mr. Miller had not read the maintenance backlog provision of the contract. Tr. at 1019–20, 1042. As a consequence, he ignored the O & A compensation provision and erroneously constructed two categories of contractor revenue, the fixed price payments and the cost plus payments due to "accidents, abuses, or incidents." DX 49 at 49.5.

In addition to the flawed method that was followed, and the lack of understanding of the contract, the Court finds numerous flaws in the expert's analysis. In determining that there were no "overruns" for parts, materials, or other direct costs, *see* DX 49 at 49.7–.8, he completely ignored the $52,250.86 in costs of contracted-out repairs. *See* PX 2D at 654. These costs included both parts and labor. *See, e.g.*, DX 125 at DX 125.9–.14. The bid upon which Mr. Miller based his analysis assumed there would no contracted-out work. *See* PX 2B, Tab 15 at 72. Thus, he necessarily undercounted the actual labor and parts costs incurred in performing the maintenance work.

Mister Miller also surmised that the amount of non-mechanics' labor was underbid, and that since the bulk of the "overrun" he calculated was due to these costs rather than mechanics' labor or parts, there must not have been "a lot of excess backlog work"

performed. Tr. at 1006–08; DX 49 at 49.12, 49.36. But in employing an "aggregate" analysis, he did not consider the actual work that was being performed. *See* Tr. at 966–67, 1023, 1041–43, 1057–58. Thus, the consequences of Fleetpro having to process a number of repair orders that were 200% to 400% of the monthly amount of its predecessor, *see* PX 2A, Tab P at P–5; Tr. at 526, or being directed to eliminate backlog information from OLVIMS, Tr. at 97, 101–03, 105–06, or being told to assemble backlog information for an REA, Tr. at 148–50, were not taken into account by Mr. Miller. He did acknowledge that if he undercounted mechanics' labor hours, this would have resulted in an overestimate of non-mechanics' hours. Tr. at 1052. A closer look at his mechanic hours calculations shows such an error undoubtedly occurred.

According to Mr. Miller's calculations, the total number of mechanic labor hours actually incurred by Fleetpro in performing the contract was 13,836, based on the ADP payroll records. DX 49 at 49.9. Fleetpro, based on the same records, calculates this number as 15,098.33 hours, *see* PX 2A at Tab A, and Mr. Miller conceded that he did not attempt to reconcile his labor hours with those itemized in REA Binder IV (PX 2D), and that he did not match all of the mechanic employee numbers used in the REA with the individual employees. Tr. at 1046–49. As defendant made no effort to identify any mechanic time that it believed was erroneously included in Binder IV, and the only mechanic discussed was first raised by plaintiff's counsel, *see* Tr. at 1049–51, 1062–67, the Court concludes that Mr. Miller has erred in this calculation.

Nevertheless, assuming for the sake of argument that this same error did not affect Mr. Miller's estimate of the number of labor hours implied by the bid to perform the in-scope work of the contract, Mr. Miller calculated that 8,518 hours were projected for six months of performance. DX 49 at 49.9. He then used this number to demonstrate that

Fleetpro was allegedly seeking to be compensated for the same work twice, by calculating that mechanic labor hours were "over budget" by 3,824, yet Fleetpro claims 9,513 mechanic hours as O & A. *Id.* Mister Miller then contended that this labor "overrun" must be due to inefficiency, since he separately calculated that "part and material costs were not above budget." *Id.* at 49.10. The Court finds this analysis flawed for a number of reasons.

First, Mr. Miller reduced the amount of hours "over budget" by the labor hours associated with repairing 355 labor hours' worth of inherited backlog,[16] *see id.* at 49.9, but this amount of required repairs was clearly within the scope of the contract. Mister Miller's separate reduction for these hours was thus inconsistent with his premise that the labor costs "bid" represent an estimate of the labor costs to perform the contract, since work on that portion of the backlog would have been compensated under the firm fixed fee portion of the contract. This inconsistency further undermines the Court's confidence in Mr. Miller's approach.

Second, Mr. Miller fails to take into account the demonstrated higher productivity of Fleetpro's labor force, as reflected in the ratio of time spent performing maintenance tasks to total payroll time. As Mr. Farcosky testified, without rebuttal from the government, the predecessor on the contract had operated at 60% productivity, and Fleetpro was expecting to achieve 80% productivity. Tr. at 117–18. Thus, where the outgoing contractor's mechanics would perform 60 hours of maintenance work for 100 payroll hours, Fleetpro believed its mechanics would perform 80. Fleetpro's records confirmed that the company hit its productivity mark, as the total mechanic hours recorded in OLVIMS divided by the total mechanic hours recorded in their payroll records shows a productivity rate of 79.7 percent. PX 2A at Tab A; Tr. at 231–32. When this increase in productivity is taken into account, the "rea-

---

16. Actually, he based this calculation on *345* hours, *see* DX 49 at 49.9 n. 15, which was 25 labor hours per 100 vehicle equivalents based on a fleet that was 1380.8 vehicle equivalents in size. *See* PX 2A at 78. On December 3, 1996, it was determined that the fleet actually totaled 1414.0 vehicle equivalents, *see* PX 1 at 127, increasing the amount of inherited backlog for which Tecom was not specially compensated. The parties agreed that the resulting calculation is 355 hours. *See Tecom,* 66 Fed.Cl. at 740.

sonableness" check provided by Mr. Miller yields results that seem much less dramatic. According to Mr. Miller, 8,518 mechanic hours were bid by Tecom to perform six months of maintenance, *see* DX 49 at 49.9—a number which is not much off the 8,320 claimed by plaintiff. *See* PX 2A at Tab A. Using Mr. Miller's number, if the bid is converted to mechanic "wrench turning" hours, at 60% productivity the resulting maintenance hours recorded would have been 5,110.8.[17] But if Fleetpro were to operate, as the record bears out, at 80% productivity, it would have needed to incur only 6,388.5 total payroll hours to accomplish this same amount of work.[18] If Mr. Miller's calculations are adjusted to take this into account, if the erroneous reduction for the in-scope backlog is eliminated, and if the full 15,098.33 in total payroll hours is employed, the result is that the mechanic labor hours "over budget" are 7,647.83, compared to the 9,513 labor hours claimed as O & A.[19]

Thus, the rough guide employed by Mr. Miller, ostensibly showing that Fleetpro claims that its increased mechanic hours due to the breach are about two and one-half times the "budget" overrun, really shows that the they exceed the "overrun" by a mere 24 percent. And given the Court's conclusion, stated above, that the size of Tecom's bid is not at all relevant given that the plaintiff has based its damages calculation on the actual costs of performing the O & A work, the Court as a consequence does not find Mr. Miller's testimony to be at all persuasive.

Based on the actual costs submitted by plaintiff, the Court finds that plaintiff incurred $818,256.87 in damages for performing O & A work, plus prejudgment interest. The damages are identical for the government's liability under the first count's con-

structive change claim or the second count's breach of contract claim. These damages are categorized below:

### 1. Direct Labor Costs

#### a. Mechanics' Regular Time: $199,289.98

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $199,289.98 in damages attributable to mechanics' regular time (i.e. non-overtime) for O & A work. *See* Tr. at 230–32; PX 2A, Tab A; PX 2D at 654. This amount is based upon plaintiff's determination of an 80% productivity rate for its mechanics. Tr. at 205–08, 231–32; PX 2A, Tab A, Tab S at S–11–12. The number of labor hours charged to various projects represents only 80% of the total hours spent on the job. Mister Farcosky explained that the remainder of his employees' time includes "training, eating, research, things that cannot be specifically charged to a particular vehicle." Tr. at 206.

The total labor hours were derived from the WIP database, which revealed that Fleetpro charged a total of 12,032.5 labor hours to various vehicle repair projects. Tr. at 230–31; PX 2A, Tab A; PX 2D at 654. These same hours can also be found recorded in OLVIMS. Tr. at 566. In order to calculate the total labor hours worked and paid it is necessary to divide the 12,032.5 labor hours by the productivity rate of 80 percent. Using this calculation, the total number of hours of mechanics' regular time was 15,040.625,[20] resulting in a total cost of $313,175.99. PX 2A, Tab A. Of the 12,032.5 labor hours logged by mechanics, the amount worked on identified O & A maintenance was 7,610.8 hours. Tr. at 201; PX 2A, Tab A; PX 2D at 654. In charging 7,610.8 labor hours to various pro-

---

**17.** Applying the 60% productivity figure to the total bid hours as represented by plaintiff results in 4,992 hours of maintenance work. PX 2A at Tab A.

**18.** This is the result of dividing 5,110.8 by .8.

**19.** This assumes for the sake of this discussion that Mr. Miller's calculation of 1,062 mechanic labor hours corresponding to Modification 001 is correct.

**20.** 12,032.5 labor hours ÷ 80% = 15,040.625 total hours. Plaintiff rounded the total down to 15,040.6. *See* PX 2A, Tab A. Fleetpro's payroll records confirmed that its mechanics recorded just 57.7 more payroll hours than would have been worked under an 80% productivity rate. *See* PX 2A, Tab A. The achieved productivity rate of 79.7% is reasonably rounded to 80 percent.

jects, Fleetpro employees worked for a total of 9,513.5 hours.[21] Based on the evidence considered at trial, however, this total includes 3.5 hours of logged time (or 4.375 hours of total time) repairing an item that was subject to an Air Force waiver. *See* PX 2D at 8 (line 250); PX 2E at 14; Tr. at 760–61. Mister Farcosky admitted that when a waiver was given to a defect, the repair was not required. Tr. at 108–09. As a consequence, the Court reduces the total damages in this category by $91.96, *see* PX 2D at 8 (line 250). Accordingly, based on the detailed records contained in the REA, the Court finds that by spending 9,509.1 total hours on O & A work, Fleetpro is entitled to $199,289.98.[22] This adjustment impacts many of the other damages calculations, as the ratio of mechanics' O & A labor costs to their total labor costs falls to 63.64 % as a result of this reduction.[23]

#### b.  Mechanics' Overtime: $6,749.58

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $6,749.58 in damages attributable to mechanics' overtime expenses for O & A work. To determine the amount of mechanics' overtime costs that could be assigned to O & A work, Fleetpro reasonably applied to the overtime figures the ratio of mechanics' regular time O & A costs to their total regular time maintenance costs. *See* PX 2A, Tab B; Tr. at 236–37. But due to the Court's determination that the costs of one repair that received a waiver were erroneously included in the calculation, the percentage to be applied should be 63.64%, not 63.7 percent (hereinafter referred to as the "mechanics' O & A percentage").

Applying the adjusted mechanics' O & A percentage to the $10,605.87 which Fleetpro incurred for total mechanics overtime pay, *see* PX 2A, Tab B, the Court finds that $6,749.58 is reasonably apportioned to O & A work.

#### c.  Labor Credit for Backlog Obligation: ($7,462.10)

The contract required Fleetpro to perform up to 355 hours of maintenance backlog work without receiving special compensation. *See* Tr. at 424; *Tecom,* 66 Fed.Cl. at 740. In the REA, Fleetpro included a credit for this backlog obligation, but calculated the credit on the basis of 353.5 hours' of labor on a backlog, rather than 355 hours. *See* PX 2A, Tab C. Employing the 355 hour figure that the parties agreed was not in dispute, the labor portion of this credit should be $7,462.10. But the Court finds that this does not provide the full credit to which the government is entitled under PWS ¶ 5.5.1. In specifying that the contractor is entitled to compensation based on "the over and above hourly rate and material costs" to the extent that the maintenance backlog it is required to reduce exceeds 355 labor hours' of work, *see* PX 1 at 88 (PWS ¶ 5.5.1), the provision necessarily implies that the material costs involved in processing up to 355 hours' worth of the backlog are not specially compensable. The Court determines that the backlog obligation credit should include the material costs associated with 355 hours' worth of repairs. The Court calculates this additional portion of the credit by taking the ratio of 355 hours to the total O & A hours, or 3.73%,[24] and applying this to the O & A totals for each of the material costs categories (parts, materials, shop and office supplies, and uniforms, rags and safety shoes). This materials backlog obligation credit is calculated below.

#### d.  Credit for Prior Contractor's Work: ($1,807.72)

When Fleetpro began its work on the contract, it found that the previous contractor had partially repaired a number of vehicles. Tr. at 424–26. Fleetpro estimated the previous contractor's labor costs for these vehicles by examining the 43 relevant open work orders and reasonably assuming that the previ-

---

21.  7,610.8 labor hours ÷ 80% = 9,513.5 total hours.

22.  This is $199,381.94 − $91.96.

23.  This is the result of dividing $199,289.98 by $313,175.99.

24.  This is 355 divided by 9,509.1.

ous contractor spent two hours on each work order. *Id;* PX 2A, Tab D. Fleetpro acknowledges that this amount should be credited against its claim for labor costs. *See* PX 2A, Tab D; PX 13. The Court finds that this amount totals $1,807.72.[25]

#### e. Maintenance Support Staff: $92,840.61

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $92,840.61 in damages attributable to the O & A work performed by maintenance support staff. Maintenance support staff includes tool & parts attendants, production control clerks, supply technicians, and other support staff whose assistance was required to perform O & A work. Tr. at 238–40. These individuals enabled the mechanics to perform the O & A work, but their time was not logged in OLVIMS or in the WIP database. *See* Tr. at 238–55; PX 2A, Tab E.

Some Fleetpro employees were hired exclusively to perform O & A work; others split their duties between O & A work and work on the regular contract. Tr. at 239–40. Those who split their time between regular contract work and O & A work would clock out when switching from one to the other, and clock in under a different time clock so Fleetpro could accurately allocate their time between the regular contract and the O & A work. Tr. at 240–42; PX 2A, Tab E. The REA contains a detailed breakdown of the contract versus O & A work performed by Fleetpro's maintenance support staff. *See* PX 2A, Tab E. Based upon this data, the Court finds that Fleetpro incurred $92,840.61 in maintenance support staff expenses attributable to O & A work.

#### f. Driver Support: $2,323.40

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $2,323.40 attributable to driver support for O & A work. Mister Farcosky testified that Fleetpro occasionally had to drive a vehicle off-site for certain repairs. Doing so required two drivers; one driver to drive the defective vehicle to the repair site, and another to follow in a non-defective vehicle to return both drivers to Peterson AFB. Tr. at 261–62. The total expense for drivers' time, including time spent under the fixed fee contract and time spent on O & A work, was $6,003.62. *Id.* at 262; PX 2A, Tab F.

Fleetpro determined that 39.1% of this amount was allocable to O & A, based on the percentage of its repair contracts costs that were spent on identified O & A repairs. Tr. at 262–63; PX 2A, Tabs F, H; *see* PX 2D at 654. As is explained below, the Court finds that the O & A repair contracts costs were overstated by $207.64; as a consequence, the percentage used to allocate driver support costs to O & A should have instead been 38.7 percent.[26] The basic approach used by Fleetpro to estimate these costs is reasonable, and the Court finds that plaintiff incurred $2,323.40 in damages related to driver support.[27]

#### g. Credit for FUTA/SUTA: ($747.90)

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff must adjust downwards its labor costs calculation to the extent it assumes that state and federal unemployment insurance taxes continued to fall on pay once the statutory ceilings were exceeded. Plaintiff calculates this credit to be $749. Tr. at 426–27; PX 2A at 170; PX 2A, Tab V. But using the lower, correct mechanics' O & A percentage of 63.64%, the Court finds this credit should total $747.90.[28]

#### 2. Other Direct Costs

The other direct costs category consists of "non-labor type items that are used to direct-

---

**25.** Fleetpro multiplied the number of work orders by two, the number of hours, and multiplied the total by a mechanics hourly rate of $21.02. PX 2A, Tab D. Fleetpro arrived at a total of $1,808.15, *id.,* but the Court's calculation totals $1,807.72. This is probably due to a difference in rounding.

**26.** This is $20,224.72 divided by $52,250.86.

**27.** $6,003.62 × .387 = $2,323.40.

**28.** This is the sum of 63.7% of the federal ($411.92) and state ($763.28) amounts. *See* PX 2A, Tab V.

ly support the repair of the vehicles." Tr. at 356.

### a. Repair Parts: $98,107.83

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $98,107.83 for repair parts due to O & A work. The total parts expense was $120,812.06. See PX 2D at 654. Fleetpro staff, at the direction and with the personal involvement of Mr. Farcosky, see Tr. 158–59, 161, 173–75, 178–81, segregated the costs of repair parts attributable to the regular contract and those attributable to O & A work. Tr. at 357–58. The WIP database contained all 22,846 individual work entries made during the course of Fleetpro's performance of the contract, and based on this compilation, the Court determines that performing O & A work entailed $98,107.83 in actual repair parts costs. See PX 2A, Tab G; PX 2D at 654.

### b. Repair Contracts: $20,224.72

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $20,224.72 attributable to repair contracts for O & A work. The WIP database documented a total of $52,250.86 spent on repair contracts, $20,432.36 of which was charged to O & A work. Tr. at 359–60; PX 2A, Tab H; PX 2D at 654. The O & A total, however, includes the cost of a cracked windshield repair, for which the contractor appears to have already been reimbursed due to operator abuse. See PX 2D at 54 (line 1864); DX 122. The Court finds that the $207.64 cost associated with this repair should be deducted from the total, resulting in $20,224.72 in repair contracts performing O & A work.

### c. Repair Materials: $15,586.44

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $15,586.44 attributable to repair materials for O & A work. According to its vendor invoices, Fleetpro determined it spent $24,491.58 on repair materials, including emissions calibration gases, fluids, cleaners, fuses, hoses and couplings, hydraulic seals, light bulbs, nuts and bolts, oils, lubricants, paint and supplies, plugs, valve stems, washers, and window sealant. PX 2A, Tab I, Tab P at P–8–9; see also Tr. at 362–63. This represents Fleetpro's total expenses, not just those attributable to O & A work.

To determine the amount of the repair materials that were linked to O & A work, plaintiff again applied the 63.7% it calculated as the percentage of mechanics' labor hour costs that were spent working on O & A projects. Tr. at 362–63. Applying the correct mechanics' O & A percentage of 63.64% to the total repair materials expense of $24,491.58, the Court finds that $15,586.44 is allocable to O & A expenses.

### d. Shop Supplies: $1,563.33

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $1,563.33 attributable to shop supplies used in O & A work. Plaintiff spent a total of $2,456.52 on shop supplies, such as car wash detergent, cleaning materials, tarps, and welding supplies. PX 2A, Tab I. While it is impossible to attribute any specific shop supplies to either regular contract work or O & A work given the fact that they are bulk purchases, see Tr. at 364, the plaintiff reasonably allocated these costs using its estimate of the percentage of mechanics' labor hour costs that were spent working on O & A. Applying the correct mechanics' O & A percentage of 63.64% to the total expenses for shop supplies, the Court finds that Fleetpro incurred $1,563.33 in O & A shop expenses.

### e. Uniforms, Rags, & Safety Shoes: $4,009.89

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $4,009.89 attributable to uniforms, rags, and safety shoes used in O & A work. These items cannot be specifically allocated to a particular vehicle. See Tr. 364–65. Fleetpro spent a total of $6,300.89 on these items. PX 2A, Tab I. Applying the correct mechanics' O & A percentage of 63.64% to this total results in $4,009.89 in O & A expenses.

### f. Office Supplies: $2,147.66

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $2,149.69 for office supplies attributable to O & A work. For the same reasons described above, it was impossible to specifically charge office supplies to individual work orders, *see* Tr. at 367–68, so Fleetpro assumed that it spent 63.7% of its office supplies on O & A work. The total amount spent on office supplies was $3,374.70. PX 2A, Tab I. Applying the correct mechanics' O & A percentage of 63.64% to this total results in $2,147.66 in O & A expenses.

### g. Materials Backlog Obligation Credit: ($4,528.79)

As the Court explained above, the government should be credited with 3.73% of the cost of Fleetpro's materials used in reducing the maintenance backlog, since it was not required to pay special compensation for 355 labor hours' worth of these repairs. The relevant O & A costs, for repair parts, repair materials, shop supplies, uniforms, rags, safety shoes, and office supplies, total $121,415.15. The backlog obligation credit for materials, accordingly, is $4,528.79.

### 3. Other Costs

The other costs category encompasses expenditures that plaintiff would not have had to incur but for the O & A work, even though they were not part of the cost of vehicle repair. Tr. at 386–95.

### a. Communications, Travel and Supervision: $24,883.95

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $24,883.95 attributable to communications, travel, and supervision expenses for O & A work. Plaintiff initially calculated that Fleetpro spent $2,510.57 on long distance telephone calls, $1,949.44 on postage and shipping, and $35,023.01 on travel, lodging, and per diem expenses. PX 2A, Tab J. Unable to charge these expenses to individual work or-

ders, Fleetpro allocated 63.7% of this amount to O & A work. *Id.* The DCAA auditor questioned $381.90 of the postage and shipping expenses, *see* PX 9, and plaintiff accepted this and reduced its request by 63.7% of that amount, or $243. *See* PX 2F at B–4. Adjusting the total postage and shipping costs by the questioned amount results in a new total of $1,567.54. Applying the correct mechanics' O & A percentage of 63.64%, the Court finds that plaintiff expended $24,883.95 on communications, travel, and supervision expenses attributable to O & A work.[29]

### b. WIP Development and Deployment: $48,688.51

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $48,688.51 as a reimbursement for WIP development and deployment. The entire cost for WIP development and deployment is a direct result of the government's breach. The Air Force required that Fleetpro repair a maintenance backlog that was far in excess of 355 labor hours' worth of work at contract turnover, creating an environment in which Fleetpro needed to track its backlog work. The Air Force requested information that was unavailable from OLVIMS, Tr. at 115–16, 124–25, 135–37, and prohibited Fleetpro from using OLVIMS to track O & A work, Tr. at 526–27, 545–46, thus creating the need for Fleetpro to develop its own database. Fleetpro hired Mr. Joseph Budge, a database development consultant, to create the WIP database. Tr. at 121. Mister Budge's time and expenses devoted to WIP development are carefully detailed in Binder I. PX 2A, Tab K; *see also* PX 5. The Court finds that Fleetpro spent $48,688.51 for WIP development and deployment.

### c. Contract Discrepancy Reports: $4,220.15

Fleetpro alleges that four CDRs, resulting in $8,161.39 in payment deductions, were based on conditions caused by the government's breach. Tr. at 392–95, 572–73; PX 2A, Tab L. The government's own witness, Mr. McCowen, testified that the massive

---

**29.** This is ($2,510.57 + $1,567.54 + $35,023.01) × .6364.

maintenance backlog that Fleetpro was required to reduce caused the discrepancies that were the bases for two of the CDRs he issued, T010 and T012. Tr. at 787–88, 791. A third CDR issued by Mr. McCowen, T007, concerned the same type of discrepancy that was the topic of T010, only for the prior month. *See* DX 67, 69, 81, 84. The Court concludes that the payment deductions resulting from these three CDRs were directly caused by the government's breach, as the required reduction in the maintenance backlog prevented Fleetpro from meeting the relevant performance standards. Thus, Fleetpro is entitled to $4,220.15 in damages due to these deductions. Plaintiff has not proven that the fourth CDR, T005—issued because six of twenty vehicles which were inspected after leaving the repair shop failed the minimum serviceability standard, *see* DX 79—resulted from the government's breach of contract.

### 4. REA Preparation: $83,378.38

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $83,378.38 in REA preparation costs. The Air Force directed Fleetpro to submit an equitable adjustment invoice at the end of the contract year in order to be compensated for O & A work, Tr. at 148–50, 614, and thus these costs were incurred for purposes of contract administration. *Bill Strong Enters.*, 49 F.3d at 1549–50. Mister Budge, the consultant hired by Fleetpro to create the WIP, was retained to create the REA. By this point, he had become a Fleetpro employee rather than an outside consultant. Tr. at 414. Mister Budge assembled the REA in consultation with Fleetpro and with Fleetpro's legal counsel. *Id.* He spent 880 hours preparing the REA, at a rate of $24.3016 per hour, costing Fleetpro a total of $21,385.41.

PX 2A, Tab N.[30] Another Fleetpro employee, Thomas Kilchenstein, spent 140.5 hours working on the REA, at a rate of $22.9704 per hour,[31] costing Fleetpro a total of $3,227.34. Fleetpro spent $69,593.63 in legal fees related to O & A work and the development of the REA. Tr. at 418–19; PX 2A, Tab N. After filing the amended REA, Fleetpro reached an agreement with one of the law firms which assisted it in the REA preparation, resulting in a savings of $11,328. Tr. at 455; PX 13. Fleetpro also spent $500 on copying. Tr. at 422; PX 2A, Tab N. The Court finds that Fleetpro spent a total of $83,378.38 on REA preparation expenses that would not have been necessary but for the O & A work.

### 5. Credit for Previous Billing: ($49,-918.00)

Defendant paid plaintiff $52,414.00 for two weeks of O & A work. Tr. at 427. The government does not dispute this amount and the Court finds that it should be credited against plaintiff's total claim. The only question is whether this credit should be applied before or after G & A and fee are calculated. Mister Miller testified, citing a document in REA Binder II, that this payment was understood to cover $49,918 in costs, with the remainder going to satisfy a 4% G & A rate and a 1% fee for Fleetpro. *See* Tr. at 1010–12; PX 2B, Tab 55 at 1. He contends that the costs portion of the payment should be credited before G & A and fee are calculated, else Fleetpro will receive more than the contract modification provided for that particular portion of O & A work. Tr. at 1011. For his part, Mr. Farcosky disclaimed responsibility for the document found in his company's REA. *See* Tr. at 518. The Court notes that Modification P00001 did contain a release clause concerning the work that was covered. DX 131 at 131.2. Under the circumstances,

---

**30.** Mister Budge's base rate was $19.23 per hour. Fleetpro had additional costs of $2.1633 per hour for federal and state unemployment taxes and FICA, $0.1183 in workers compensation insurance, and $2.79 per hour in benefits and liability insurance. Thus, Fleetpro had to pay a total of $24.3016 per hour for each hour that Mr. Budge spent preparing the REA. PX 2A, Tab N.

**31.** Mister Kilchenstein's base rate was $18.04 per hour. Fleetpro had additional costs of $2.0295 per hour for federal and state unemployment taxes and FICA, $0.1109 in workers compensation insurance, and $2.79 per hour in benefits and liability insurance. Thus, Fleetpro had to pay a total of $22.9704 per hour for each hour that Mr. Kilchenstein spent preparing the REA. PX 2A, Tab N.

the Court is persuaded by Mr. Miller that the proper treatment of the costs portion of this payment would be to deduct it prior to the G & A and fee calculation. In the absence of any more specific proof, the Court will presume that the document contained behind Tab 55 of Binder II represents the actual distribution of the payment amount between costs, G & A and fee. Accordingly, $49,918 of this credit will be applied before Fleetpro's G & A and fee are calculated.

### 6. Fleetpro's Corporate G & A: $126,848.19

Based upon the testimony of Mr. Farcosky and the evidence presented at trial, the Court finds that plaintiff is entitled to $126,848.19 for general and administrative expenses, or overhead, due to its O & A work. Fleetpro originally calculated its G & A rate to be 16.1 percent. See Tr. at 422; PX 2A at 171; PX 13. Fleetpro hired an accountant to review its REA in preparation for the DCAA audit and discovered it had underestimated its G & A rate; the accountant recommended raising the rate to 23.9 percent. Tr. at 437; see PX 2F at 1, B–2, B–4. The DCAA auditor accepted this higher rate. See PX 10 at SU 0357–58. After a second audit of Fleetpro's G & A was requested by the Air Force, the DCAA recommended a downward adjustment of the G & A percentage from 23.86% to 23.51 percent. See Tr. at 456; PX 12 at G110157; PX 13. The Court finds no reason to depart from the DCAA determination. Applying this G & A rate of 23.51% to the costs (and credits) described above, which total $539,549.92, the Court finds plaintiff is entitled to $126,848.19 in Fleetpro G & A expenses allocable to the O & A work.[32]

### 7. Fleetpro's Corporate Fee: $79,967.77

Fleetpro also seeks to recover a twelve percent corporate fee, or profit. See PX 2A at 171; PX 2F at B–4; PX 13. Mister Farcosky testified that Fleetpro historically earned a twelve percent profit. Tr. at 423–24; see also PX 2A, Tab P at P–15. The government's breach of contract, and expansion of the maintenance work required of Fleetpro, caused the subcontractor to divert resources and personnel from its other operations, from which it would have received its typical profit. Accordingly, the Court finds that Fleetpro has established that lost profits are a proximate result of the government's breach of contract. See Cal. Fed. Bank, 245 F.3d at 1349. Plaintiff is entitled to receive as part of its damages an additional twelve percent of Fleetpro's total O & A expenses, as a reasonable corporate fee in the amount of $79,967.77.[33]

### 8. Credit for Previous Billing: ($2,496.00)

As was discussed above, the remainder of the credit for the payment made under Modification P00001 should be deducted prior to the calculation of any prime contractor G & A or fee. See supra section II.B.5. This amount is $2,496.00.[34]

### 9. Tecom's Corporate Fee: $74,386.99

Plaintiff also seeks to recover, on its own behalf as the prime contractor, damages based on its own G & A expenses and corporate fee. See PX 2F; PX 13. Mister Gilchrist, Tecom's Executive Vice President during the performance of this contract, testified that 5.5% was Tecom's G & A rate for processing and administering contracts for the relevant year, as audited by the DCAA. Tr. at 617. He did not explain, however,

---

**32.** $199,289.98 (mechanics' regular time) + $6,749.58 (mechanics' overtime)- $7,462.10 (labor credit for backlog obligation)- $1,807.72 (credit for prior contractor's work) + $92,840.61 (maintenance support staff) + $2,323.40 (driver support) - $747.90 (unemployment credit) + $98,107.83 (repair parts) + $20,224.72 (repair contracts) + $15,586.44 (repair materials) + $1,563.33 (shop supplies) + $4,009.89 (uniforms, rags & safety shoes) + $2,147.66 (office supplies)- $4,528.79 (materials backlog obligation credit) + $24,883.95 (communications, travel & supervision) + $48,688.51 (WIP development and deployment) + $4,220.15 (contract discrepancy reports) + $83,378.38 (REA preparation)- $49,918 (credit for previous billing)= $539,549.92. 23.51% of $539,549.92 = $126,848.19.

**33.** $539,549.92 + $126,848.19 = $666,398.11. Twelve percent of $666,398.11 is $79,967.77.

**34.** This is $52,414 minus $49,918.

whether this G & A rate applied to subcontracts, or to the work actually performed by Tecom. *See id.* The Court notes that the bid for the maintenance portion of the contract, contained in the REA, shows no G & A amount for Tecom. *See* PX 2B, Tab 15 at 71. Nor was prime contractor G & A included in $52,414 proposal submitted by Tecom which led to Modification P00001. *See* PX 2B, Tab 55 at 1. The Court concludes that plaintiff has failed to prove that it is entitled to G & A expenses relating to the O & A work.

Tecom also requests a ten percent fee, on top of the damages suffered by its subcontractor. Mister Gilchrist testified that this mark-up is a reasonable profit for a prime contractor to make on a subcontract. Tr. at 617–18. Although the bid contained just a one percent markup for the prime contractor's profit, the Court finds that, given the increased work performed by the subcontractor due to the government's breach of contract, a ten percent corporate fee for Tecom is reasonable. *See Delco Elecs. Corp. v. United States,* 17 Cl.Ct. 302, 334 (1989) (awarding a ten percent profit to a prime contractor for equitable adjustment relating to subcontractor's work), *aff'd,* 909 F.2d 1495, 1990 WL 98851 (Fed.Cir.1990). Tecom is entitled to recover a corporate fee in the amount of $74,386.99.[35]

### 10. Prejudgment Interest

The Court finds that plaintiff is entitled to prejudgment interest pursuant to 41 U.S.C. § 611. The relevant date for calculating the prejudgment interest is May 22, 1998, when Tecom submitted the REA to the Air Force. *See* PX 2A.

### 11. Total Damages

Based on the foregoing, the Court finds that the government's breach of contract caused Fleetpro to incur $743,869.88 in damages, and Tecom to incur $74,386.99 in damages, for a total of $818,256.87, plus interest. The Court finds, in the alternative, that this same sum would be owed plaintiff as an equitable adjustment resulting from the government's constructive change to the vehicle maintenance portion of the contract.

## III. CONCLUSION

The Court had previously determined defendant's liability to plaintiff for breach of contract, on summary judgment regarding plaintiff's second cause of action. Based on the same undisputed facts, the Court has determined that defendant is liable to plaintiff for a constructive change to the subject contract, entitling plaintiff to an equitable adjustment under its first cause of action. Judgment has already been granted to defendant on the fifth cause of action. Plaintiff's third and fourth causes of action are hereby **DISMISSED** with prejudice.

After reviewing the testimony and evidence presented at trial, the Court concludes that plaintiff has proven by a preponderance of the evidence that it is entitled to damages in the amount of $818,256.87, plus interest. The Clerk shall enter judgment for plaintiff on the first and second causes of action, in the amount of $818,256.87, with interest pursuant to 41 U.S.C. § 611, calculated from May 22, 1998.[36] Of this amount, $743,869.88 is awarded on behalf of the subcontractor Fleetpro, Inc., and $74,386.99 is awarded on behalf of prime contractor Tecom, Inc.

**IT IS SO ORDERED.**

---

**35.** Fleetpro's portion of the damages totaled $743,869.88 ($666,398.11 + $79,967.77 − $2,496.00). Ten percent of this amount is $74,386.99.

**36.** The judgment should also include, if this amount has not yet been paid, the $19,948.30 that defendant owes plaintiff pursuant to the Memorandum Opinion and Order of October 2, 2006.